**TKO EQUIPMENT COMPANY,**
Plaintiff–Appellee/Cross–Appellant,

v.

**C & G COAL COMPANY,**
**INC., Defendant,**

and

**Whayne Supply Company,**
Defendant–Appellant/Cross–Appellee.

Nos. 88–1222, 88–1311.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1988.

Decided Nov. 29, 1988.

Rehearing Denied Dec. 23, 1988.

Dennis B. Longest, Buthod Longest Rietman & Steedman, Evansville, Ind., for defendant-appellant/cross-appellee.

C. David Johnstone, Barnett & Alagia, New Albany, Ind., for plaintiff-appellee/cross-appellant.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

C & G Coal Co. either leased or bought two earthmovers from TKO Equipment Co. If C & G leased them, then Whayne Supply Co. owns them today; if C & G bought them, then TKO owns them. If this were not confusing enough, the parties disavow their own documents. TKO, which drew up a lease proclaiming that it was not retaining a security interest ("LESSEE and LESSOR hereby agree that this transaction is an equipment lease and not a sale or other secured transaction"), promptly filed in the right place for notices under the Uniform Commercial Code a declaration that it had sold the equipment to C & G and was retaining a purchase money security interest. TKO was trying to have things both ways and ultimately persuaded the district court in this diversity action that despite what the lease said, this transaction was a sale with a retained security interest. Since C & G was indebted to TKO on other accounts, the security interest survived payment of the price of the two earthmovers, the court held. TKO therefore prevailed over Whayne, which repaired the earthmovers and took a security interest in them—surrendering entitlement to a repairman's super-priority lien. C & G is defunct. The only issue we shall have to decide is whether Whayne has an interest superior to TKO's.

TKO leased or sold C & G a total of five pieces of heavy equipment. We are concerned with the first two, a brace of used Caterpillar D9G tractors—popularly called bulldozers, although technically the "bulldozer" is only the blade the tractor wields. The parties signed a lease and an option to purchase. The printed lease provided for a monthly rental of $15,122.91, with a minimum term of one month; the lease contained the clause we have quoted disclaiming the creation of a security interest. The typewritten option to purchase stated:

It is ... contracted and agreed by the parties hereto that lessor in consideration of the sum of One Dollar ($1.00) and other good and valuable considerations and for the same considerations and the mutual covenants and agreements set forth in written contract above referred to, hereby gives and grants to lessee the option and privilege, at any time after the expiration of One months from the date hereof and before the termination of said written contract and agreement, to purchase the property therein described and leased, for the sum of Ninety Thousand Seven Hundred Thirty–Seven and 46/100 Dollars ($90,737.46) less 100% of rentals, previously paid by the lessee to the lessor on this equipment, the lessee to exercise the option to purchase by written notice thereof to lessor; and in the event lessee exercises the option to purchase herein given, 100% of all sums paid as rental, by lessee to lessor shall be applied upon the purchase price of said property and the balance due upon the purchase price shall be paid in cash. Since lessee has no obligation to purchase the above-described machinery or equipment, it is understood and agreed

between the parties hereto that it is not the intent of either lessor or lessee that this option be construed as a secured transaction under the Uniform Commercial Code and no security interest is either granted or reserved by either lessor or lessee.

Notwithstanding the last sentence, TKO immediately filed with Indiana's Secretary of State a form UCC–1, asserting that it had a security interest in the tractors. It did not attach the lease or the option to buy.

The price reflected the parties' knowledge that the tractors needed substantial repairs. C & G hired Whayne to perform them, which it did at a cost of about $60,-000. It had trouble collecting from C & G, and promptly after C & G had paid its sixth monthly installment—becoming entitled to exercise the option at no additional cost—Whayne filed a form UCC–1 claiming a security interest in the earthmovers. (The district court may have believed that C & G had to pay an additional $1 to exercise its option, but it is apparent that the mention of $1 was boilerplate to show that the grant of an option to purchase was supported by consideration; the agreement did not require an additional $1 on exercise.) C & G was behind on its payments on other equipment bought or leased from TKO, however, and TKO refused to release its (asserted) security interest in the two D9G tractors, contending that its interest in them also secured future advances on other equipment. Whayne posted a bond in TKO's favor and took control of the tractors, letting C & G use the equipment while attempting to overcome its financial difficulties (and not incidentally pay off its debt to Whayne). C & G soon collapsed, however, owing money to both TKO and Whayne. Each now claims to hold the senior interest in the earthmovers.

Everyone assumes that C & G signed a future advances clause, UCC § 9–204(3), so that if the lease and option "really" is a sale, making TKO a secured party, then TKO's interest is senior to Whayne's. Everyone also assumes that if the arrangement is a "true lease", then TKO's filing did not perfect a security interest, and

Whayne, as the only party with a real security interest, wins. (We need not decide whether this assumption is correct.) TKO and Whayne disagree about how the lease and option should be characterized. TKO argued, and the district court held, that these documents amounted to a sale and the retention of a purchase money security interest, because six months' rental equalled the option price. The arrangement was simply a disguise for a sale, the district court believed. Whayne, for its part, emphasizes that C & G was not obliged to pay six months' rent but could have returned the tractors, without penalty, after the first month—and it had some incentive to do so in light of the impending costly repairs. The lease and option legally committed C & G to pay only ⅙ of the purchase price, and the arrangement, viewed from this perspective, was a "true lease" because one could comply fully with the lease yet not be entitled to exercise the option without paying ⅚ of the whole price. All of these considerations are relevant under the UCC, adopted in Indiana, see Ind. Code § 26–1–1–201(37) (defining security interests); both sides marshal respectable authority in Indiana (whose law governs). E.g., *In re Marhoefer Packing Co.*, 674 F.2d 1139 (7th Cir.1982) (Indiana law); *Morris v. Lyons Capitol Resources, Inc.*, 510 N.E.2d 221 (Ind.App.1987); *United Leaseshares, Inc. v. Citizens Bank & Trust Co.*, 470 N.E.2d 1383 (Ind.App.1984); *Bolen v. Mid–Continent Refrigerator Co.*, 411 N.E.2d 1255 (Ind.App.1980). See also James J. White & Robert S. Summers, **Uniform Commercial Code** § 22–3 (2d ed. 1980) (collecting cases).

Before going on, we must ask why the characterization matters. Why would TKO sign documents loudly abjuring sale or security interest, while simultaneously claiming to have one? If a seller wants to make an installment sale, why not be plain? The answer—putting tax considerations to one side—lies in bankruptcy law. The automatic stay, 11 U.S.C. § 362, disables secured parties from repossessing what they have sold. Creditors receive neither the contracted-for payments nor the possession

of the chattel, the value of which may diminish during the bankruptcy case. If the value of the item exceeds the debt, the secured party is entitled to the "indubitable equivalent" of its security, including interest, in exchange for surrendering the right to immediate repossession. 11 U.S.C. §§ 361(3), 363(e). If the value of the property is less than the debt, however, the lender is "undersecured" and is unlikely to receive interest (unless the debtor has the means to pay all claims in full) or anything approaching the "indubitable equivalent" of the property. *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Any lender will obtain, at best, the remaining balance of the debt; if the value of the security exceeds the debt, the excess will be used to satisfy other creditors.

How much more comfy to be assured of receiving the property back, intact. A lessor is likely to be able to retrieve a leased item unless the lessee continues to pay rent, in which case the lessor is preferred over other creditors. If the lessee can't pay the rent, the lessor will get back the whole thing, reclaiming any equity the lessee may have been building toward the day of exercising an option to buy.

So sellers doubting their buyers' financial stability often seek to cast their transactions as leases with options to buy. This erodes the security of other creditors. Buyers that depend on credit from third parties may find that jeopardizing the position of these other lenders is too costly, so they will not agree to leases that remove assets from the reach of other lenders. But if buyers do agree and then roll belly up, the other creditors may be counted on to contend that the purported lease should be recharacterized as a sale, with the usual consequences of a sale and security arrangement. TKO's strategy—signing a lease and option disclaiming any "sale" but providing (in the lease) that "in the event this transaction should ever be construed as a secured transaction, LESSEE hereby grants LESSOR a security interest in the equipment described in this lease", and then filing a notice in the UCC filing system—is adapted to the end at hand: staking out as good a position as possible in the event of the buyer's collapse. The seller-lessor prefers to characterize matters as a "lease" but maintains a sale-and-security fallback position in the event the bankruptcy court won't bite.

Our case does not fit the pattern, however. C & G did not fail before completing the payments to TKO on the two tractors that Whayne repaired. It paid in full. Other creditors have not contended that the "lease" should be unmasked and revealed as a sale. They are quite willing to accept that the transaction was a lease, just as TKO and C & G called it. Whayne wants TKO held to its own characterization of the transaction. TKO, having written and signed documents repudiating sale-and-security status, is in the uncomfortable position of trying to doff its own disguise.

There is at least a presumption in the law, as in economic life, against having and eating one's cake simultaneously. TKO signed two documents spurning a security interest in the tractors. TKO hoped that this would improve its position in the event of C & G's bankruptcy. It recognized that strangers to the transaction might be able to pierce form to get at substance. *All* of the cases TKO cites in which courts have looked through the form of a lease to conclude that the transaction was a sale (because the option price was so small in relation to the residual value of the. item that the "lessee" was certain to exercise it) are suits brought by strangers to the transaction. We asked TKO's lawyer at oral argument whether he knew of any case, in any state, in which the "lessor" had been allowed to attack its own characterization of the transaction. Counsel knew of none. Our own search has not turned up such a case. All we could find were cases fitting the pattern of our own *Marhoefer* decision, in which the challenge to the characterization came from a third party.*

---

* In *Marhoefer* the debtor signed a lease agreement with Reiser & Co., which Reiser invoked in the bankruptcy in order to reclaim the property. Marhoefer's trustee in bankruptcy, using

TKO has a security interest, vis-à-vis C & G, if and only if it bargained for one and signed an agreement memorializing it, see UCC § 9–203(1)(a); TKO has an interest superior to Whayne's only if it got that interest from C & G. Buyers are free to grant or decline to grant such interests (just as sellers may refuse to sell without obtaining them). If the parties strike a bargain in which the buyer does not purport to grant, and the seller does not purport to take, a security interest, then there is no such interest. Cf. *Rempa v. LaPorte Production Credit Ass'n*, 444 N.E.2d 308 (Ind.App.1983). Section 9–203(1)(a) requires a signed writing, which serves at least in part to protect future creditors against inventive assertions of prior security. White & Summers § 23–3 & n. 7; see also *Whitmore & Arnold, Inc. v. Lucquet*, 233 Va. 106, 353 S.E.2d 764 (1987); *Tate v. Gallagher*, 116 N.H. 165, 355 A.2d 417 (1976). The UCC does not require creditors to furnish would-be third-party lenders with copies of security agreements, but putative lenders often can get them from borrowers. UCC § 9–208, § 9–402 comment 2. Whayne not only inquired into C & G's arrangements with TKO, learning of the lease-and-option arrangement, but also learned that C & G had completed paying for the tractors and filed its own claim immediately. In other words, it took TKO's documents at face value. TKO cannot enforce against Whayne an interest it did not obtain by contract from C & G, and the writings it signed foreswore the creation of a security interest. TKO vociferously maintains that it and C & G "intended" their documents to be a sale-and-security arrangement. This amounts to a proclamation that they were trying to pull the wool over the eyes of strangers, which is not a plausible way to better their position.

Under the prevailing will theory of contract, parties, like Humpty Dumpty, may use words as they please. If they wish the symbols "one Caterpillar D9G tractor" to mean "500 railroad cars full of watermelons", that's fine—provided parties share this weird meaning. A meaning held by one party only may not be invoked to change the ordinary denotation of a word, however. E.g., *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–16 (7th Cir.1987). Intent must be mutual to be effective; unilateral intent does not count. Still less may the parties announce that they "share" an unusual meaning to the detriment of strangers, who have no way of finding out what was in the contracting parties' heads.

If TKO and C & G had written: "this document is either a sale or a lease, to remain our secret until we know which will give us the greatest benefit at the expense of strangers", no court would enforce this "meaning". In a famous *gedanken* experiment of quantum mechanics, Schrödinger's cat remains suspended between life and death in a box, neither alive nor dead until the box is opened and uncertainty about the decay of a radioactive particle is resolved. TKO wants us to believe that its agreement with C & G is like Schrödinger's cat, neither a sale nor a lease until uncertainty about C & G's payments and solvency is resolved and TKO knows which characterization is more favorable. We doubt that Indiana would allow contracting parties such latitude. Just as a one-man corporation may not pierce its own corporate veil to endow the shareholder with the firm's rights, *Kush v. American States Insurance Co.*, 853 F.2d 1380, 1383–84 (7th Cir.1988), so the author of a lease may not pierce its form to get at a "substance" that it suddenly finds more lucrative.

In deciding whether to extend credit and forbear its possessory repairman's super-

the strong-arm powers in bankruptcy to represent the interests of other creditors, attacked the characterization. This court ultimately concluded that the arrangement was a "true lease" after considering multiple factors. The court's approach would lead to the conclusion that if rental payments are mandatory (and thus are the equivalent of payments on a debt), an option to purchase at trivial cost following the conclusion of the mandatory payments shows that the instrument is intended for security. See UCC § 1–201(37). We do not question this holding; it is simply inapplicable when the lease does not provide for such mandatory payments and the lessor attacks its own instrument.

priority lien, Whayne was entitled to rely on the documents TKO and C & G signed. These documents purported to be leases and options to buy. Whayne read (or could have read; the difference is not material) TKO's repeated disclaimer of a security interest. Whayne was entitled to believe that until C & G paid six months' rent (or paid the full option price), C & G had nothing in which Whayne could take a security interest, but that once six months' rent had been paid, C & G owned the tractors free and clear. Whayne thought (or was entitled to think) that it was gambling on C & G's solvency for about four months. TKO's position extended that risk indefinitely—while TKO reserved the option to argue, had C & G become insolvent during the lease term, that the document was a lease after all. No case in Indiana or any other state permits such a maneuver. TKO signed a lease, and a lease is what it had.

REVERSED.