**BANK OF NOVA SCOTIA**

v.

**EQUITABLE FINANCIAL MANAGEMENT, INC. and A.R. Scalise, Inc.**

**Civ. A. No. 87–593.**

United States District Court, W.D. Pennsylvania.

Feb. 16, 1989.

Joseph S. Sisca, Pittsburgh, Pa., for plaintiff.

George Medved, Pittsburgh, Pa., for defendant Scalise.

Wm. Alvah Stewart, III, Houston Harbaugh, Pittsburgh, Pa., for defendant Equitable.

## MEMORANDUM AND ORDER

SMITH, District Judge.

This is an action for conversion. Several machines for use in sheet metal fabrication were sold by Power Ventilation Canada, Ltd. (PV) in violation of a perfected security interest held by plaintiff, Bank of Nova Scotia (Nova Scotia), to which PV was indebted in the amount of approximately $123,000. The machinery was shipped to defendant A.R. Scalise, Inc. (Scalise), a Pennsylvania corporation. The transaction was financed by and title was taken by defendant Equitable Financial Management, Inc. (EFM). On January 6, 1988, this Court, per Honorable Hubert I. Teitelbaum,

entered summary judgment in favor of plaintiff Nova Scotia against Scalise, ruling that Scalise possessed and refused to return the machinery in violation of Nova Scotia's security interest. The computation of damages, the liability to Nova Scotia of defendant EFM, and the crossclaims of Scalise against EFM were left for another day. Subsequently the matter was reassigned to this judge on November 8, 1988. On November 15, 1988, we directed Scalise to surrender the equipment to Nova Scotia to give effect to Judge Teitelbaum's Order of January 6, 1988.

Currently before the Court are cross-motions for summary judgment by defendants Scalise and EFM. This matter was originally listed for trial for Monday, December 12, 1988, but in the afternoon of December 9, 1988, plaintiff Nova Scotia informed the Court by letter that it was satisfied that possession of the machinery provided it with an adequate remedy and implicitly abandoned any further claim for damages against either defendant. We presume Nova Scotia based its decision on the evaluation of its expert's appraisal of the machinery which we had ordered at the December 5, 1988, pretrial conference. Later in the afternoon of December 9, 1988, defendants Scalise and EFM proposed to submit Scalise's crossclaims against EFM on a case-stated basis. Having received the final reply brief on January 9, 1989, we proceed to dispose of this action. At the same time we address the surrender of possession of the machinery, stayed by our Order of December 12, 1988.

Scalise asserts two theories of liability against EFM. First, it claims that EFM breached its warranty of title to Scalise that the machinery was free of liens or claims; secondly, it claims that EFM was negligent in failing to undertake the lien search which would have disclosed Nova Scotia's security interest, before financing the purchase of the equipment. Counsel for Scalise has ably set forth the elements it must prove to prevail in its breach of warranty crossclaim against EFM: (1) that the EFM–Scalise transaction imposes on EFM the warranty of title requirements of

Article 2 of the Uniform Commercial Code;[1] (2) that EFM did not or could not convey good title to the machinery due to the prior interest of Nova Scotia; (3) that Scalise purchased the machinery without knowledge of the security interest; and (4) EFM did not exclude the warranty of title. The crux of the matter, it can be seen, is the characterization of the EFM–Scalise relationship. Scalise contends that EFM purchased the equipment from PV and is, despite the use of a lease form, a seller of goods subject to the warranty of title requirements in its contract for sale to Scalise. 13 Pa.C.S. Section 2312. EFM maintains that it merely provided financing to Scalise and owes no warranty of title to Scalise because its lease is a security interest, and only a security interest, which does not subject EFM to the requirements of Article 2 of the UCC. 13 Pa.C.S. Section 2102.

## Tort Theory

■ Before beginning our analysis of the breach of warranty claim, we address briefly the tort theory advanced by Scalise. If EFM is, as we find here, merely acting as the financer of the purchase of machinery from PV by Scalise, no duty is imposed on EFM to search for liens against the machinery for the benefit of Scalise. There are sound business reasons for a lender to search for encumbrances on equipment the purchase of which it expects to finance and on which it expects to secure its own encumbrance. We also find from the evidence that it is business custom for a lender to search for liens on used machinery in a sale-leaseback arrangement in which it is purchasing equipment from the borrower itself. However, we are cited no statute or case which imposes a duty on a lender to conduct a lien search for the benefit of the borrower solely due to its status as a lender. Accepting, as we do, Scalise's evidence that EFM has the great-

er expertise to conduct a lien search, we still decline to create new legal duties in the market place.

## Warranty Theory

It is not in dispute that Scalise and EFM entered into a lease agreement (See Brief of EFM In Support of Motion for Summary Judgment, Exhibit "1") signed February 3, 1986, under which EFM provided $100,000 for the purchase of the fabricating machinery and under which Scalise agreed to make sixty (60) monthly payments to EFM of $2,409.38. See Pretrial Stipulation VI, 5. EFM provided $85,000 directly to PV and $15,000 to Scalise in reimbursement for an earlier deposit that Scalise had made to PV. The lease provided, inter alia, that EFM made no warranties of fitness or merchantability to Scalise, that EFM had the sole option to terminate the lease if Scalise did not receive the machinery from PV within sixty (60) days, that Scalise bore all risk of loss or theft, and, in paragraph 24, that:

Equipment is, and shall at all times remain, the property of [EFM] and [Scalise] shall have no right title or interest therein or thereto except as expressly set forth in this lease.

Additionally, Scalise and EFM agreed that, upon the expiration of the lease term, Scalise would have the option to purchase the machinery for one dollar. (See Brief in Support of Motion of A.R. Scalise, Inc., for Summary Judgment, Exhibit "A"; Exhibit "J" (Buckman deposition, 13)).

Several sections of Pennsylvania's Uniform Commercial Code are relevant to assessing these facts, beginning with 13 Pa. C.S. Section 2312:

(a) Subject to subsection (b) there is in a contract for sale a warranty by the seller that:

(1) the title conveyed shall be good, and its transfer rightful and

(2) the goods shall be delivered free of any security interest or other lien or

---

**1.** In this claim concerning the interpretation of Pennsylvania contracts made between two Pennsylvania corporations to be performed in Pennsylvania, we apply Pennsylvania commercial law. 13 Pa.C.S. Section 1101 et seq. Although the Commissioners have proposed sig-

nificant alterations in the treatment of finance leases and personalty leases generally in the 1987 revisions to the UCC, Pennsylvania UCC sales law remains principally based on its 1979 reenactment of the Act of October 2, 1959, P.L. 1023.

encumbrance of which the buyer at the time of contracting has no knowledge.

(b) A warranty under subsection (a) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

EFM therefore gave a warranty of title to Scalise, unless the exceptions above mentioned apply, if it formed a contract for sale. A contract for sale is defined in 13 Pa.C.S. Section 2106:

"Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A sale consists of the passing of title from the seller to the buyer for a price (section 2401).

Title passes as provided in 13 Pa.C.S. Section 2401(2):

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of goods, despite any reservation of a security interest....

All of these provisions are limited in their application by 13 Pa.C.S. 2102 which states that the above rules do

not apply to any transaction which although is the form of an unconditioned contract to sell or present sale is intended to operate *only* as a security transaction ... (emphasis added).

The meaning of "security transaction," is illuminated darkly by the definition of security interest in 13 Pa.C.S. Section 1201:

The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (section 2401) is limited in effect to a reservation of a "security interest."

\* \* \* \* \* \*

Whether a lease is intended as security is to be determined by the facts of each case; however:

(1) the inclusion of an option to purchase does not of itself make the lease one intended for security; and

(2) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The equipment lease plainly operated as a security agreement, since Scalise had the option to become the equipment owner for the payment of a nominal one dollar amount after the end of the five year lease period. Unless the lease was intended "only" as a security agreement (Section 2102), the lease and option also operated as an Article 2 contract for sale, since EFM's title would pass upon satisfactory expiration of the lease and the nominal payment by Scalise of one dollar.

EFM directs us to this Circuit's interpretation of this area of New Jersey law in *General Electric Credit Corporation v. Ger–Beck Machine Co.*, 806 F.2d 1207 (3d Cir.1986). In *Ger–Beck* a three-cornered purchase-financing lease by General Electric Credit Corporation in all relevant respects identical to the one here was held not to be a sale within Article 2. Ger–Beck, which had attempted to revoke its acceptance of certain equipment delivered from a manufacturer, was held, despite a vigorous dissent by Judge Becker, to have no Article 2 remedies against its lender-lessor.

With this case stands Judge Easterbrook's opinion, interpreting Indiana UCC law, in *TKO Equipment Co. v. C & G Coal Company, Inc.*, 863 F.2d 541 (7th Cir.1988). Therein, a panel for the Seventh Circuit held that a transaction containing elements of both lease and sale with retained security interest would be treated as a lease so as not to defeat the security interest of a third party creditor of lessee. TKO Equipment, the financing lessor in that case, sought to claim a priority interest in earth-moving equipment delivered to C & G Coal, a lessee which had performed all of its duties under the equipment lease and

**682**

which had exercised its option to purchase the earthmovers for a nominal amount, but which remained indebted to TKO Equipment on other equipment. TKO Equipment claimed that its transaction was a sale with a retained security interest, a status which would allow it priority in exercising the security interest perfected by TKO's filing of a financing statement. As that panel construed Indiana law, the deliberate structuring of a transaction as a lease in order to allow TKO Equipment to reclaim the earthmovers outside of bankruptcy court in case of insolvency during the lease period would estop it from abandoning that characterization to obtain a priority claim over the equipment after the lease period.

Behind the holdings of *Ger–Beck* and *TKO Equipment,* and of numerous bankruptcy court decisions characterizing finance leases as sales, e.g. *In re United Nesco Container Corporation,* 68 B.R. 970 (Bankr.E.D.Pa.1987); *In re New Hope and Ivyland R. Co.,* 353 F.Supp. 608 (E.D.Pa. 1973), is a common philosophy that financing arrangements should be interpreted to harmonize with commercial reality and to protect the expectations that a third party would reasonably have formed based on the form that lessor and lessee have chosen. Thus, in *Ger–Beck,* the Court held that a lender who merely acts as a financier of an equipment purchase, despite its acquisition of title from the equipment supplier and its contract to sell to the equipment user, is not an Article 2 seller for purposes of revocation of acceptance or implied warranties of quality. The equipment user is to look to the manufacturer or supplier. At the same time, as the dissent in *Ger–Beck* and the Court in *TKO Equipment* recognized, it is unreasonable to allow a lender to use its considerable leverage in structuring transactions to obtain priority remedies against all the world in case of its lessee's default while abjuring all duties to the borrower.

■ In the present case, therefore, we hold that a finance lease with mandatory lease payments (cf. *TKO Equipment,* supra) and an option to buy for a nominal amount is a contract for sale as well as a security transaction. The acquisition and retention of title by the lessor pending exercise of the buyout option, rather than securing its interest solely by filing its financing statement, imposes on the lender the warranty of title duties of 13 Pa.C.S. Section 2312.

■ In order to establish its crossclaim however, Scalise must also establish that the encumbrance on the title warranted to it by EFM was one of which it had no knowledge. It is on this rock that Scalise founders.

Mark Scalise, the vice-president of defendant Scalise responsible for its involvement in the machinery purchase, became interested in the fall of 1985 in purchasing sheet metal fabricating equipment, and responded to an ad in "SNIPS", a sheet metal trade magazine, placed there by what he described as Power Ventilation, but which actually was the Easy Machinery Corporation, a broker in new and used equipment. (Brief of EFM, Exhibit "2" (Scalise deposition); Ward Affidavit, paragraph 3). On January 10, 1986, Scalise flew to Winnipeg, Manitoba, and went with Raymond Ward, the treasurer of Easy Machinery Corporation, to PV's place of business to inspect the equipment eventually to become the subject of this lawsuit. Scalise and Ward reached an oral agreement that Scalise would purchase the equipment for $123,000. Scalise returned to Pennsylvania the same day. (Ward Affidavit, paragraphs 4–6). Ward followed this on January 11, 1986, with a mailgram reciting the terms of the agreement. (Ward Affidavit, Exhibit "A"). Shortly thereafter on January 15, 1986, Scalise sent a purchase order confirming this intended purchase. (Ward Affidavit, Exhibit "B"). Scalise had also contacted Keith Keeling, at that time an employee of EFM, to arrange for financing of the purchase, and signed a memorandum lease proposal reflecting the purchase price of $123,000, on January 15, 1986. (Keeling Affidavit, Exhibit "A").

Meanwhile, Ward on behalf of Easy Machinery had agreed to purchase the machinery from PV for resale to Scalise, for the

amount of $95,500.00. At the direction of Rich Savoie of PV, Easy Machinery issued a check for $15,000.00 as a deposit and sent it, on January 21, 1986, to the Bank of Nova Scotia. (See Keeling Affidavit, Exhibit "D" (Savoie letter of January 14, 1986, directing payment of $15,000 to Bank of Nova Scotia); Exhibit "C" (PV invoice to Easy of January 15, 1986, in amount of $95,500); Exhibits "E–1", "E–2", "E–3" (Easy Machinery letter and supporting documents confirming transmittal of check no. 7250)).

Sometime after January 15 and before February 3, 1986, Scalise was contacted by Rick Savoie, of PV, who told him that he had fired Mr. Ward and would deal directly with Scalise, offering to sell him the machinery for $100,000. (Brief of EFM, Exhibit "2" (Scalise deposition, 96)). Scalise, who stated that he regarded the difference between $100,000 and $123,000 as Ward's mark-up, agreed to buy directly from PV for $100,000. (*Id.*, Scalise deposition, 96–98).

Savoie had, on January 23, 1986, represented to Ward that the sale to Easy and thereafter to Scalise could not be consummated because the Bank of Nova Scotia would be retaining Easy's $15,000.00 deposit. (Ward Affidavit, paragraph 11; Exhibit "F"). On January 23, 1986, Hutchinson Lawson, a manager for the Bank of Nova Scotia, did inform Ward that the Bank held a second mortgage on the machinery. (Ward Affidavit, Exhibit "E–1".)

Having informed Ward that he could not go through with the sale and having represented to Scalise that Ward was out of the transaction, Savoie proceeded to sell directly to Scalise the same machinery that Scalise would have purchased from Easy. Scalise issued a second purchase order, on January 21, 1986, this time to PV, this time for $100,000. (Brief of EFM, Exhibit "3"). Scalise also on January 21, 1986, sent a letter to Ward which cancelled the Scalise–Ward agreement for the stated reason that the Scalise–Ward agreement had called for a one-third down payment. (Ward Affidavit Exhibit "G"). Scalise proceeded to negotiate the new finance lease with EFM for

$100,000. Scalise deposited $15,000 with PV, an amount later reimbursed by EFM, and EFM paid the remaining $85,000 directly to PV. (Pretrial Stipulation VI, paragraphs 6, 7.)

Scalise did not know that the machinery as sold by PV was subject to the Bank of Nova Scotia's interest, and did not inquire. (Plaintiff's Motion for Summary Judgment As To Damages, Exhibit "B" (Scalise deposition, 52–58)). Scalise was made aware, prior to consummating the purchase of the machinery, of Ward's umbrage at being cornered out of the deal, by a telegram from Ward dated January 29, 1986. (Ward Affidavit, Exhibit "H").

Based on the evidence of record, Mark Scalise knew, or was under a duty to know, that the equipment he was negotiating the purchase of from PV may have been subject to a security interest of another. It is insupportable to imagine that a deal negotiated with a broker on January 10, 1986, for the purchase of machinery for $123,000.00 could be transformed no more than eleven days later into a direct sale for $100,000.00 without putting the prospective purchaser—and despite EFM's acquisition of title, Mark Scalise uncontestedly negotiated the purchase himself—on notice that something was amiss. The January 29, 1986, Ward telegram, as well as Scalise's own letter to Ward of January 21, 1986, gave Scalise notice and show that Scalise knew that Ward had not been simply "fired" by Savoie. Scalise was under a duty to proceed with caution, or not at all.

In summary, we hold that EFM does not have a duty, solely because of its role as a lender, to conduct a lien search for the benefit of a borrower. We further hold that a finance lease coupled with a purchase option for a nominal amount imposes the duty to warrant good title on the lender-lessor as stated in Section 2–312 of the Uniform Commercial Code. We find finally that the security interest that Nova Scotia had in PV's equipment was one that Scalise should have had knowledge of at the time it formed a contract in February 1986 with EFM, and therefore EFM breached no warranty of title to Scalise.

## ORDER

AND NOW, this 16 day of February, 1989, for the foregoing reasons, judgment is hereby entered on the crossclaim in favor of Equitable Financial Management, Inc. Judgment having previously been entered in favor of Bank of Nova Scotia against A.R. Scalise, Inc., only, it is further

ORDERED, that our Order of December 12, 1988, is vacated, and defendant Scalise is directed to surrender the machinery listed in our Order of November 15, 1988, within twenty (20) days.