**In re HISPANIC AMERICAN TELE-VISION CO., INC., and Times Square Studios, Inc., Debtors.**

**Bankruptcy Nos. 89 B 15544, 89 B 15545.**

United States Bankruptcy Court, N.D. Illinois, E.D.

April 10, 1990.

**454**

David N. Missner of Rudnick & Wolfe, Chicago, Ill., for debtor.

Neal Wolfe and Charles P. Schulman of Winston & Strawn, Chicago, Ill., for Motorweek.

Arthur Steinberg of Kaye, Scholer, Fierman, Hays & Handler, New York City, for General Health Finance Corp.

David N. Missner of Rudnick & Wolfe, Chicago, Ill., for debtor.

Neal Wolfe and Charles P. Schulman of Winston & Strawn, Chicago, Ill., for Motorweek.

Arthur Steinberg of Kaye, Scholer, Fierman, Hays & Handler, New York City, for General Health Finance Corp.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

The issue before the court is whether an agreement, designated "Equipment Lease" ("Lease"), between Hispanic American Television Co. [Companies], Inc. ("HATCO"), the Debtor, and Motorweek Productions ("MW"), a partnership between Ken Squier Productions, Inc. and the Lirol Corporation, setting forth the terms and conditions for the possession and use of certain television production equipment ("Equipment") for a five-year term is a true lease or a security instrument. As a lease, the Equipment remains the property of MW with HATCO's rights possessory as provided for in the Lease. If the Lease is a security instrument, the Equipment is property of the Debtor's estate and MW's interest is that of a secured creditor, with the rights of such a creditor under local law, provided it has complied with such law concerning the perfection of a security interest in personal property. General Health Finance Corporation ("GHFC") claims a priority interest ahead of MW's in the Equipment by way of a perfected security interest.

For the reasons herein set forth, the court determines that the Lease is a security agreement.[1]

## JURISDICTION

The matter arises under §§ 362(d), 363(e) and 365(d)(2) of the Bankruptcy Code, 11 U.S.C. § 101, et seq. The court has jurisdiction over this dispute under Title 28 U.S.C. § 1334. The matter is a core proceeding under Title 28 U.S.C. § 157(b)(2) and is before the court for decision pursuant to Local Rule 2.33 of the Northern District of Illinois referring bankruptcy cases and proceedings to the Bankruptcy Court for hearing and determination.

## INTRODUCTION

The Lease was executed by HATCO and MW on November 11, 1987 with an effective date of July 12, 1987 and establishes a five-year term for HATCO's possession and

---

1. The court has entered separate Findings of Fact and Conclusions of Law of even date.

use of the Equipment. Under the Lease, HATCO is to make monthly payments of $55,624.97 over a five-year term for a total payment of $3,337,498. The Lease was amended on January 19, 1988, June 20, 1988 and December 16, 1988. (MW Exhibits # 5–10).

By letter dated November 10, 1987 MW gave to HATCO, subject to conditions not now relevant, the right to purchase the Equipment during the five-year term ("Options"). (HATCO Exhibit I). These Options were subsequently modified again under conditions not here relevant. The Options range in price from $1,500,000 in 1987 to $75,000 at the completion of the five-year term. (MW Exhibits # 3, 5, 8 and 9).

The default provisions of the Lease [2] give MW a range of remedies, from electing to retake the Equipment and terminating the Lease, to holding HATCO liable for the total payments to be made over the five-year term or, perhaps, both (See ¶ 11 of the Lease below):

10. *Default.*

(a) If the Lessee fails to make a monthly payment when due in accordance with Section 2 hereof, then the Lessor shall give prompt written notice of such failure (the "Payment Default Notice") to the Lessee and to M. Lee Pearce, M.D. ("Dr. Pearce"). The date on which the Payment Default Notice is effective (pursuant to Section 14 hereof) shall be the "Payment Default Notice Date". If the Lessor does not receive such payment from the Lessee or on behalf of the Lessee within ten days after the Payment Default Notice Date, then the Lessor shall draw upon the Letter of Credit (whenever such term is used herein, as defined in Section 20 hereof) and give prompt written notice of such action to the Lessee and to Dr. Pearce. If, after a draw under a Letter of Credit, a Letter of Credit has not been provided to the Lessor within the later of (i) ten days after notice is given to Dr. Pearce and to the Lessee of a draw upon the Letter of Credit as provided in the preceding sentence and (ii) 20 days after the Payment Default Notice Date, then, if and to the extent permitted by applicable law, the Lessor shall have the right to exercise any of the remedies specified in Section 10(b) below.

(b) If the Lessee shall default in the performance of any other covenant or warranty herein contained and such default shall continue uncured for a period of thirty (30) days after written notice thereof to Lessee;

then, if and to the extent permitted by applicable law, the Lessor shall have the right to exercise any of the following remedies:

(1)(i) Upon five days written notice, Lessee will be obligated at Lessee's expense, to gather and deliver to the possession of the Lessor the Equipment at the location where the Equipment was in last use before this Lease, and in the condition required pursuant to the terms of Section 15 hereof. Upon such delivery, all rights of the Lessee in the Equipment shall terminate absolutely and this Lease shall terminate.

(ii) Upon Lessor's option, either upon failure of delivery by Lessee as is required by the preceding Section 10(b)(1)(i), or in lieu of request of such delivery and without demand, notice, or legal process, Lessor has the absolute right and is specifically authorized by Lessee to enter the premises where the Equipment may be found, whether or not the premises are locked, and take possession and remove the same, whereupon all rights of the Lessee in Equipment shall terminate absolutely and this Lease and/or any other Lease between Lessee and Lessor shall terminate. Lessee waives all claims arising from damage of the Equipment premises where the Equipment is located which may result from Lessor entering the premises and taking possession of the Equipment as is authorized by this Section. Lessee further waives any defenses to Lessor's entering the premises and taking possession of the Equipment, including, but not limited to, any claim based on trespass.

---

**2.** When the word Lease is used, it shall mean the Lease and all applicable amendments.

The Lessee's waiver of damage claims defenses, and remedies under this Section is to the fullest extent allowable under the law.

(2) To bring legal action to recover all rents or other amounts (a) then accrued or (b) thereafter accruing for the period during which the Lessee's default hereunder continues, due from Lessee to Lessor under this lease;

(3) To pursue any other remedy available to the Lessor at law or in equity; provided, however, that Lessor shall be placed in no better position by virtue of any one or more of its remedies provided in this Section 10 than it would have been in had the Lessee not defaulted and had paid its full rental obligation under this lease and returned the Equipment when due.

11. *Remedies.*

*All remedies of the Lessor are cumulative, and may, to the extent permitted by law, be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy provided, however, that Lessor shall be placed in no better position by virtue of any one or more of its remedies than it would have been in had the Lessee not defaulted and had paid its full rental obligation under this lease and returned the Equipment when due.* No failure on the part of the Lessor to exercise, and no delay in exercising, any right or remedy shall operate as a waiver thereof unless specifically waived by the Lessor in writing; nor shall any single or partial exercise by the Lessor of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy to the extent permitted herein (emphasis added).

HATCO has defaulted under the Lease and as of January 10, 1990, owed MW the sum of $525,000.

MW has moved for an order conditioning continued use of the Equipment by HATCO on provision of adequate protection; or, alternately, modifying the automatic stay;

and shortening the time within which HATCO must assume or reject the Lease.

In response to MW's motion, HATCO asserts that the Lease is not a true lease which would permit the relief requested in the Motion but, instead, is a security instrument, making the Equipment part of the Debtor's estate.

This court must first determine whether the Lease as amended is a true lease or a "sham" and in fact a security agreement. A hearing to determine the nature of the Lease was held on January 9 and 10, 1990, at which the parties and GHFC appeared and presented evidence. The court heard argument on February 13, 1990.

## LEASE VIS–A–VIS SECURITY AGREEMENT

The determination of whether the Lease executed by the parties is a true lease or a security agreement is controlled by § 1–201(37) of the Uniform Commercial Code:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.

. . . . . .

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The parties agree that the Lease contains a choice of law provision stating it will be governed by the law of New York. Section 1–201(37) of the U.C.C. is identical in New York and Illinois. The case law from both states is relevant on the issue of distinguishing a "true lease" from a security agreement. (*See,* N.Y.U.C.C. § 1–201(37) (McKinney Supp.1981–82); Ill.Rev.Stat. Ch. 26 ¶ 1–201(37) (1989).) Further, given the

uniformity purpose of the UCC, decisions from other states which have adopted its standard provisions are also relevant.

■ In its analysis of the nature of the Lease, this court will consider four relevant factors: 1) the actual terms of the Lease, 2) the circumstances which existed and the actions of the parties prior to and at the time of execution of the Lease, 3) whether the option price to purchase the Equipment at the completion of the term of the Lease constitutes nominal consideration and 4) whether a lease of personal property under which a lessor bargains away all of the meaningful value of that property, leaving little or no residual value at the end of the term, may ever be considered a true lease under the UCC.

## THE TERMS OF THE LEASE

The essential character of a contract must be examined to determine its status as a lease or security agreement. *In re Access Equipment*, 62 B.R. 642, 645 (Bkrtcy.D.Mass.1986). The terms of the Lease provide that HATCO is to be responsible for the maintenance of the Equipment, to pay all taxes associated with the Equipment, and to bear the risk of all loss or damage of or to the Equipment. (MW Exhibits # 6–10). Nothing here is unusual in the lease of personal property. The court understands that these terms are typical in a lease of personal property, as they allocate the responsibilities both according to who most efficiently will bear them and the relative bargaining power of the parties. *In re Marhoefer Packing Company, Inc.*, 674 F.2d 1139, 1146 (7th Cir.1982).

Further, the terms which deny HATCO the ability to assign the Equipment, require it to maintain insurance for its market value replacement and call for the Equipment to be returned to MW at the end of the five-year term indicate that MW did not desire to give up control of the Equipment or its right to receive it back upon a default by HATCO if it so chose.

Therefore, upon its face, the Lease is not atypical of the terms found in a true lease but conforms.

## THE CIRCUMSTANCES UNDER WHICH THE LEASE WAS ENTERED

Because the UCC states the facts of each case will impact the analysis of the characterization of a lease as a security instrument where there is ambiguity as to the nature of the instrument, the facts of the negotiations between the parties regarding a lease should be considered. *In re Sherwood Diversified Services, Inc.*, 382 F.Supp. 1359, 1362 (S.D.N.Y.1974). Similarly, these facts may be considered to shed light upon the true economic substance of a lease regardless of the parol evidence rule because, due to ambiguity regarding the nature of a lease, these facts may not be able to be ascertained from the language of the contract between the parties itself. *In re X–Cel, Inc.*, 46 B.R. 202, 205 (N.D.Ill.1984) and *In re PCH Associates*, 804 F.2d 193, 198 (2nd Cir.1986).

At the hearing on this matter, Frederick Rheinstein, Chief Executive of MW, provided the history of the negotiations as they transpired prior to and during preparation of the Lease. This testimony made clear that MW had ceased operations in New York and wanted to sell the year and a half-old Equipment and, even more importantly, to rid itself of any obligations under the lease for the premises in which the Equipment was located. That MW strongly preferred to sell the Equipment to HATCO is to state the obvious.

Despite MW's desire to sell the Equipment to HATCO, HATCO could not obtain the funds to buy the Equipment. MW attempted to facilitate HATCO's purchase of the Equipment by assisting it in securing financing, by extending deadlines for and increasing the number of options for outright purchase of the Equipment and by easing the requirements under the Lease regarding the required letter of credit. The rental amount, some $55,000 per month, representing a per annum interest factor of over twenty percent on the $1,500,000 worth of the Equipment, indicates to the court that HATCO had every incentive to purchase rather than to continue to lease the Equipment at those prices.

Further, Rheinstein's testimony regarding the breakdowns in communications between MW and HATCO during the negotiations and HATCO's inability to find a financing source, despite MW's industry contacts and assistance, provide ample evidence that MW was justifiably wary of dealing with HATCO. Despite that wariness and influenced by the fact that MW "was far more concerned about getting out of the real estate lease" (Tr. Rheinstein at 284), MW reluctantly continued the "temporary" lease agreement initially entered into with HATCO, rather than accomplish the sale MW would have preferred. (MW Exhibits # 2, 3 and 5.)

While Marcelino Miyares, President of HATCO, testified that he intended to purchase the Equipment, there was no evidence that HATCO was ever in a position to complete the purchase, either in accordance with the provisions of the Lease or otherwise. Though HATCO elected to purchase the Equipment as stated in Miyares' letter to Rheinstein of September 22, 1987, it did not fulfill the requirements for sale. (MW Exhibit 4.)

After reviewing the parties memoranda, the testimony and the exhibits, there is no doubt in this court's opinion that the parties as between themselves intended the document designated as "Equipment Lease" as a true lease notwithstanding that both would have preferred a sale. The parties extended for a term of five years the so-called temporary lease which had allowed HATCO to begin its business and cement its first contract with the TWA Travel Channel and which also allowed MW to rid itself of obligations under its lease of the New York Studio.

MW, because of its superior bargaining power, after all it had control of the Equipment which HATCO wanted, extracted terms which if HATCO could have met would have, in the court's opinion, resulted in such a profitable operation that HATCO would surely have been in a position to exercise one of the numerous Options to purchase the Equipment. The Equipment, according to the testimony presented taken as a whole, wears out, becomes inefficient and obsolete at varying rates and must be replaced with more advanced components. To remain competitive in its market, during and certainly by the end of the Lease term, HATCO would necessarily have upgraded, replaced, added significant value by cost of labor or parts, or phased out of current use the vast majority of the goods making up the leased Equipment. By the end of the term, HATCO would have used up the effective life of the Equipment. If, because of its kid glove treatment of the Equipment, the pieces still working had exceeded their expected life expectancies and their value exceeded $75,000, HATCO would have exercised the option. If the Equipment had been replaced in total, HATCO would likely have asked where MW would like the obsolete Equipment returned. MW, though, has in all candor advised this court that it did not want the Equipment back, it did not want to lease it, it did not want to finance its sale, all it wanted to do was to sell it and be done with it. The Lease was entered into begrudgingly on MW's part. MW is not in the business of leasing or selling equipment and it could not realistically use the Equipment itself at the end of the Lease term, as it runs an operation which demands state-of-the-art technology.

The court's determination that the parties did indeed intend to enter into a lease of the Equipment does not end the enquiry. Regardless of this intent, if the instrument arrived at must be construed as something else by a disinterested party, that objective, inherent characterization of the document must control as to third parties. *Fashion Optical*, 653 F.2d 1385, 1390 (10th Cir.1981); *Beker*, 69 B.R. 937, 939 (Bkrtcy.S.D.N.Y.1987); *In re Kempker*, 104 B.R. 196, 204 (Bkrtcy.W.D.Mo.1989); *TKO Equipment Company v. C & G Coal Company, Inc.*, 863 F.2d 541, 545 (7th Cir. 1988) and *Bank of Nova Scotia v. Equitable Finance Management, Inc.*, 708 F.Supp. 678, 682 (W.D.Pa.1989). The Debtor in possession is like a third party for these purposes under 11 U.S.C. § 1107.

## NOMINALITY OF CONSIDERATION

The third way in which the Lease must be scrutinized to determine the true purpose is by reflection upon whether the purchase option price which would allow HATCO to become the owner of the Equipment at the completion of the five year term may be reasonably construed to be nominal.

While $75,000 at the end of the five-year term was the only option price initially stated in the Lease, there were five purchase options contained in the letter agreement dated November 10, 1987 (HATCO Exhibit I) and twelve additional option prices and periods for election were added by subsequent Lease amendments (MW Exhibits # 8–9). The Lease as amended remains the document controlling the transaction between HATCO and MW for use and purchase of the Equipment.

Some courts have evaluated the nominality of an option price payable upon the completion of the term of a lease in order to become the owner of the property by comparison of such option price to the total rent to be paid. *National Equipment Rental Ltd. v. Priority Electronics Corp.,* 435 F.Supp. 236, 238–239 (E.D.N.Y.1977) and *Matter of Herold Radio & Electronics Corp.,* 218 F.Supp. 284, 285–286 (S.D.N.Y. 1963), *aff'd.,* 327 F.2d 564 (2nd Cir.1964). Others have compared such option price to the original cost of the equipment. *Percival Construction Co. v. Miller & Miller Auctioneers,* 532 F.2d 166, 171 (10th Cir. 1976). Typically, courts have resorted to these comparisons when faced with no other basis from the evidence presented to them upon which to make their judgments as to nominality. However, the most widely recognized method of judging the nominality of such an option price for a rapidly depreciating asset, such as the television production equipment which constitutes the bulk of the Equipment, is by comparison of such option price to what the fair market price of the goods will be at the time the option may be exercised. *Marhoefer,* 674 F.2d at 1144–1145 and *In re Loop Hospital Partnership,* 35 B.R. 929, 938 (Bkrtcy.N.D. Ill.1983).

Obviously, in this case, the fair market price of the Equipment at the end of the five-year term, July, 1992 was not known in 1987 and cannot, in 1990, be conclusively determined. The court must, however, analyze by projection the nominality of the $75,000 option price. The only way to determine the nominality of this amount is to consider what the parties anticipated the fair market price of the Equipment would be five years down the pike at the time the Lease was drafted in 1987. This method of testing nominality is especially appropriate in a case such as this one in which exhaustive testimony has been presented to the court on the admittedly declining but contested market value of the Equipment.

Rheinstein testified the necessity of setting a realistic option price became apparent when his attorneys handling the HATCO/MW transaction advised that the $1 option price in the letter of intent under which the parties initially operated (MW Exhibit # 1) had to be increased to avoid future determination that the transaction was intended as security (U.C.C. § 1–201(37)). Rheinstein also testified that the $75,000 option price was his low-ball estimate in 1987 of what the Equipment would be worth in July, 1992. He further stated his high projection at that time was $100,000 but that the choice was made to go with the lower figure.

Miyares testified that if he had been asked in 1987, he would have set the 1992 fair market price of the Equipment at $500,000. Miyares' projection, in the court's opinion, cannot carry the weight of Rheinstein's candid statements on how the price was determined. First, Rheinstein's experience in the field is extensive—over 35 years at the time of execution of the Lease. Second, Miyares' projection may well be influenced by his consideration of the actual value to him of maintaining the Equipment as opposed to having to shut down operations and replace it. Third, Miyares would not have advocated the inclusion of a $500,000 option price in the Lease as presently written. Fourth, Miyares never mentions the need to replace portions of the existing leased Equipment with up-dated equipment.

One of the purposes of such an option is to guarantee a lessee that, by bearing the risk that the goods will not decline in value to a point lower than the option price, it will be rewarded by not facing renegotiation with a potentially coercive lessor when the term of its lease expires and the lessee is disadvantaged by its need to keep the goods, so to be able to continue its on-going business without interruption. Miyares would not have bargained away this opportunity even though he might have felt the Equipment would have a greater value.

Comparison of the $75,000 option price to the projected fair market price of the Equipment given by the experts at the hearing, ranging from $427,415 to $37,750, only exacerbates the uncertainly in the analysis, as any figure presented today remains speculative.

The $75,000 option price cannot be deemed to be nominal if there is a rational basis for the $1,425,000 decline in value which was projected by Rheinstein in 1987. From the evidence presented at the hearing, the court determines that the amount of anticipated decline in value from the original purchase price offered to HATCO is reasonable and rational and that, therefore, the $75,000 projected as the fair market price of the Equipment in 1992 is also reasonable and rational. There are three specific and independent reasons presented at the hearing supporting this position.

First, the rapid advances in technology. The witnesses at trial unanimously stated that there has been dramatic and regular innovations in the television production equipment field since the 1970s. The rate of innovations has been accelerating beyond their own expert expectations. The new equipment (gear) presented at the annual spring trade show for the industry each year automatically ages previously released equipment by one year. Unlike autos, which provide relatively fungible transportation year to year, television production equipment provides an increasingly sophisticated end product with each model change and provides it in a generally less expensive (i.e., VCRs or PCs in 1986 compared to 1990) and more compact form.

Thus, equipment for the prior year is not only used but will also most likely be technologically inferior.

Second, the maintenance of the Equipment. A crucial factor in the usefulness and continued high-calibre output of the Equipment is the manner in which it is maintained. When the $75,000 option price was set, Rheinstein knew that MW would be abandoning the day-to-day control over the Equipment and the quality of its maintenance and the skill of the operators. Specifically on this point, testimony was given by the experts that equipment used by the same personnel daily will last longer and retain more reliability than equipment used by personnel who change on a daily basis. While HATCO is required to keep the Equipment in good repair (¶ 4, MW Exhibit # 5), merely keeping the Equipment in good working order does not guarantee that even its used value will not decline due to diminished quality resulting from the way it is handled and the way the maintenance is accomplished. Also, as this Equipment ages it becomes more expensive to maintain due to higher costs of the regularly required replacement components initially and the declining availability of parts. HATCO's need to replace expended components (as provided in ¶ 4 of the Lease) is debatable, given its obligation only to return the Equipment in good working order at the end of the term, excluding normal wear and tear. What is normal wear and tear as respects equipment which has become obsolete? No evidence was submitted. Typically, equipment in the highly competitive, quality conscious television production and post-production industry would not be constantly maintained or rejuvenated but would be phased out of operation and replaced with newer technologically superior models. Arguably therefore, HATCO would, over the course of the Lease term, if it was to remain competitive in its market, be expected to be taking pieces of the Equipment out of service and replacing them with newer models. This would result in a goodly portion of the Equipment being on hand merely for backup rather than day in and day out usage when the Lease term expired and all the

Equipment was to be returned. HATCO could at that time negotiate to purchase only that part of the Equipment essential to its non-interrupted operations. However, the $75,000 option price, less than two month's rent, set by MW appears to have anticipated this scenario and represents the best estimate of the value of the pieces of Equipment still functioning satisfactorily and essential to continuity of HATCO's operation.

Third, the market for the Equipment at the end of the term of the Lease. When MW set the $75,000 option price it, consciously or not, considered only entities similar to itself to be the likely buyers in July, 1992. Accordingly, given the limited number of facilities which perform the services similar to that of MW and HATCO, it would be unlikely that any of them would be in the market for the six and a half-year old Equipment as a complete package and impossible to predict that any such entity would be interested in entering the business just at that moment and purchasing antiquated, and perhaps unreliable equipment to make its first impression on the industry. It was partially this limited market in 1987 which caused MW to deal with and continue to negotiate with HATCO, despite MW's preference to sell the Equipment outright. In actuality, developments since 1987 have probably caused the projected 1992 fair market price to increase, based upon the larger market which would be looking for a packaged system than was predictable in 1987. There now appears to be an increased demand for working studios by local cable stations granted franchises on a shoestring budget, aspiring performers desiring to cut demo videos, companies doing increased training using visual aids and even attorneys seeking conference quarters to videotape depositions. This market change could provide some explanation for the higher 1992 projected sales prices opined by HATCO's experts, who are involved in a greater spectrum of Equipment usage than that of the post-production expert presented by MW.

As with the total package market, the market for individual items could not have been projected to be any rosier at the time the option price was set in 1987. The existence of a buyer interested in replacing a piece of equipment with an identical model or scavenging for spare parts would be mere happenstance and could not have been relied upon in predicting the 1992 fair market value.

Therefore, after hearing the testimony of the experts on market value presented by both parties, the court has determined that in 1987 the projected fair market value of the Equipment in July of 1992 could reasonably have been anticipated to be $75,000. Though the $75,000 option price for purchase of the Equipment at the end of the Lease's five-year term is not substantial, it cannot be deemed nominal and the Lease, therefore, cannot be construed as a security instrument solely on the basis of a "nominal purchase option price."

However, nominal option price is merely one factor to be considered and is not a prerequisite to finding the Lease was in fact a security agreement. *Beker*, 69 B.R. at 944.

## MW'S MEANINGFUL RESIDUAL INTEREST IN THE EQUIPMENT

The court is of the opinion that the controlling question in this matter is, **can one enter into a lease of personal property for the full remaining economic life of that property and which results at the end of the term in the return to the lessor of property having little or no value and have such a lease deemed a true lease under the Uniform Commercial Code? Put another way, can a lessor lease property for what amounts to its total useful life expectancy and still have it considered a lease?** [3] The court believes the answer must be in the negative. The real world effect of such a lease is a sale of the leased property to the lessee. The residual value may be more than nominal in amount, ($75,000) but the end result of

---

**3.** Here the option price on completion of the term of the Lease equals less than one and one-half month's rent. Also MW's expert testi- fied the Equipment would be worth less than one month's rent.

such an undertaking is that the lessee has extracted all of the economic value of the property anticipated by the lessor and paid to the lessor for such right.

If the Lease terms are fully carried out, the result would be a return of more than a nominal sum to the lessor, but would have also meant that the lessor had received payments representing the whole of what the parties believed the value of the Equipment to be except for scrap, spare parts or a reincarnated life in another industrial environment than that represented by HATCO's and MW's operations and not considered at the time the Lease was made. The $75,000 option price provided MW with the assurance that it would not be burdened with the Equipment at the end of the Lease term—not insurance that it would regain possession of the Equipment. Where the term of the lease as intended by the parties is substantially equal to the life of the leased property such that there will be nothing of a meaningful value to return at the end of the lease, the transaction is in essence a sale. *Marhoefer*, 674 F.2d at 1145 and *Beker*, 69 B.R. at 943.

While the disposition of this matter cannot be made merely upon analysis of whether the option price for which HATCO could purchase the Equipment at the end of the Lease represents "nominal" consideration that test does provide guidance on the issue of residual value. What the "nominal option price" test really measures is whether or not the lessor has actually bargained away all of its meaningful value in the goods. The result of such a bargain is that at its conclusion the value of the goods, as measured from the lessor's perspective, has passed to the lessee. The lessor expects to merely pass title to the goods to the party who has already paid for and received the benefit of their anticipated useful lives.

Thus, while the $75,000 purchase option price is not nominal in amount and, despite the testimony presented regarding MW's intent that the Lease be a "true lease" and

the lease-like structure of the Lease, the court has determined that at the time the Lease was executed, when HATCO became obligated to make all the payments required under the Lease for the full five years, MW did not realistically anticipate receiving back from HATCO at the end of that term Equipment with any remaining meaningful useful life or of any appreciable value. The binding obligation to make all payments is how HATCO is distinguished from the debtor in *Marhoefer* and the lack of measurable residual value is how the Equipment differs from the Klystron tubes in *In re Providence Television Limited Partnership*, 86 B 5387, 87 A 576, 87 A 691, *slip op.* (Bkrtcy.N.D.Ill. 11/2/87), *aff'd.*, 1988 WL 78133 (N.D.Ill. 7/20/88).

Moreover, the total of the five years of payments which HATCO was bound to make under the Lease represented not only payment for the use of the Equipment and loss of its value, but the return to MW of the original cost of the Equipment plus interest at the rate of approximately 21%. This gives this Lease transaction the economic substance of a security agreement. *See, In re Pacific Express, Inc.* 780 F.2d 1482, 1485 (9th Cir.1986).

These three factors: 1) the obligation of HATCO to make the Lease payments, 2) no meaningful residual value in the Equipment to be returned to MW for its or any other like users' purposes at the end of the term and 3) payments to MW representing the cost of the Equipment plus interest as a return on investment, leave no room but to find that MW bargained away all its meaningful residual value in the Equipment.[4] *Loop Hospital*, 35 B.R. at 933 and *National Equipment*, 435 F.Supp. at 239.

Consistency in transactions under the UCC is highly valued and dependent on interpretation of documents according to their stated terms and the objective effect of those terms. It can be argued that a document which guarantees payment of $75,000 or return of equipment reasonably anticipated to be worth that amount could

---

4. For an interesting discussion on this subject, see Haley and Spjut, *When is an Equipment Lease a Security Agreement under the Uniform*

*Commercial Code,* Practising Law Institute Basic UCC Skills 1989: Article 2A (1989).

not be interpreted by an interested reader of the document to represent other than meaningful residual value. This argument is flawed, however, by the fact that the objective value of the document to the maker is what price the marketplace would fix for an assignment of the actual rights reserved by the maker under the document. In this case, the optimum value MW could receive for transfer of its rights under the Lease would be determined on the basis of the stream of income to be derived from the monthly payments, as adjusted by the prospects for their payment—not upon the fluctuating market value of the Equipment itself nor the likelihood that it would be re-acquired at the end of five years.

MW bargained for high payments and attempted to protect its lessor status in the event of bankruptcy. However, this protection cannot be accomplished in a vacuum, free from accepted criteria for perfection of a security instrument. At least one drafter of the Lease understood this and provided that a financing statement is to be recorded "if this lease is deemed to be a security agreement", a little late indeed.

## CONCLUSION

For the foregoing reasons, the court finds and determines that MW, by the terms of the Lease, effectively bargained away all meaningful value of the Equipment and the transaction must be deemed a sale and the Lease found to be a security instrument rather than a true lease. MW's Motion will be denied.