919 F.2d 1343
 13 Employee Benefits Ca 1158
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
INDEPENDENT FRUIT AND PRODUCE CO., a Missouri corporation, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
Walter A. RUBIN, d/b/a M.J.M. Produce Exchange, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
SUGAR RIPE BANANA COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
N.E. FRIEDMEYER-SELLMEYER DISTRIBUTING COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
Salvatore PUPILLO, d/b/a Pupillo Fruit Company, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
GEORGE A. HEIMOS PRODUCE COMPANY, INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
WILLIAM MANTIA FRUIT COMPANY, INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
ST. LOUIS BANANA AND TOMATO COMPANY, INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
LAMPERSON FRUIT & PRODUCE COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
LOMBARDO FRUIT AND PRODUCE COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
JOHN MOON PRODUCE COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
STANLEY PRODUCE, INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
Robert JOHNSON, d/b/a J. Johnson, Fruit & Produce Company, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
Adolph A. SOLOMON and Irl S. Solomon, statutory trustees for
Adolph & Ceresia Produce Co., Appellees.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
UNITED FRUIT & PRODUCE COMPANY, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
GOLDMAN FRUIT & PRODUCE CO., INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
Jules J. SCHWARTZ and Joseph F. Schwartz, d/b/a New Market
Produce Company, Appellees.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
FRANKLIN PRODUCE COMPANY, a Missouri Corporation, Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellants,
v.
MARSKE PRODUCE COMPANY, INC., Appellee.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellees,
v.
GEORGE A. HEIMOS PRODUCE CO., INC., Appellant.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Howard McDougall, Trustee, Appellees,
v.
N.E. FRIEDMEYER-SELLMEYER DISTRIBUTING COMPANY, Appellant.
 Nos. 89-1927 to 89-1929, 89-1933 to 89-1937, 89-2204 to
89-2210, 89-2438, 90-1160 to 90-1162, 89-2839 and 89-2840.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1990.
Decided Dec. 6, 1990.
 
 Albert M. Madden, Margaret M. Fahrenbach, Neal S. Deodhar, Rosemont, Ill., for appellants.
 Mark Pasewark, St. Louis, Mo., for appellee.
 Before FAGG and BEAM, Circuit Judges, and WOODS,* District Judge.
 BEAM, Circuit Judge.
 
 
 1
 In this consolidated appeal, Central States, Southeast and Southwest Areas Pension Fund (Central States) appeals from judgments entered in favor of defendants-employers. Pursuant to sections 502 and 515 of the Employee Retirement Income Security Act, 29 U.S.C. Secs. 1132, 1145 (1988), Central States brought separate actions against more than twenty independent produce wholesalers to collect delinquent pension contributions. Central States contended that the produce companies failed to make pension contributions on behalf of certain employees as required by the governing collective bargaining agreements. Central States argued that these employees, whose questionable status was discovered in an audit, were regular employees for whom contributions were due. The employers, however, classified these employees as "casuals" for whom contributions were not required by the collective bargaining agreements. The district court found that the collective bargaining agreements were ambiguous and looked to the intent and past practice of the parties to define "casual employee." The district court held that a "casual employee" is not necessarily a person who works only intermittently or sporadically, as Central States thought, but, instead, includes those employees so designated by the employer, with the consent of the union, regardless of their work schedules. Accordingly, the district court found no contributions owing and entered judgment for defendants. We reverse.[1]
 
 I. BACKGROUND
 
 2
 Due to their physical proximity on several city blocks in St. Louis, the defendants-employers in these cases, members of the St. Louis Fruit and Produce Association, are collectively known as Produce Row. Most are independently owned, family-run companies, wholesaling fresh fruits and vegetables to small, independent grocers. Central States is an employee benefit fund as defined by ERISA. See 29 U.S.C. Sec. 1002. Central States, which is headquartered in Chicago, receives more than 5,000 collective bargaining agreements for review each year, covering more than 250,000 active participants and 125,000 retired participants. In this case, contributions to the pension fund are governed by collective bargaining agreements negotiated by the employers and Local 688 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 
 
 3
 The collective bargaining agreements at issue cover the years 1973 through 1988 and are dated 1973, 1976, 1979, 1982 and 1985. Because they contain similar provisions on casual employees, the agreements dated before 1982 can be conveniently considered together. The pre-1982 agreements provide in Article IX that casual employees are to be hired subject to need, that their hiring cannot increase "the normal then existing number of working employees," that casuals cannot work more than eighty hours per month, and that casuals are to be used as replacements for regular employees. Article IX was renegotiated in 1982 so that many of these restrictions on the use of casuals were eliminated. Generally, however, all relevant agreements provide that casual employees receive neither fringe benefits nor seniority. At issue is not whether casuals are entitled to benefits, but, rather, which employees are casuals.
 
 
 4
 The dispute over the meaning of "casual employee" arose from a random audit in October 1983 of Lamperson Fruit and Produce Company. As a result of the audit, which covered September 28, 1980, to September 24, 1983, Central States claimed that Lamperson owed $73,034 for " 'non-reporting of eligible Plan Participants.' " Central States, Southeast & Southwest Areas Pension Fund v. N.E. Friedmeyer-Sellmeyer Distrib. Co., No. 84-1669 C (5), slip op. at 6 (E.D.Mo. Apr. 28, 1989). In its audit, Central States discovered employees who worked more or less full-time during the audit period but whom Lamperson classified as casuals. Because it understood casuals to be employees who worked only sporadically or intermittently as needed, Central States contended that these employees were regulars for whom contributions were due. In the resulting action to collect delinquent contributions, Central States requested audits of the Produce Row employers.
 
 
 5
 On January 16, 1985, the Chief Judge of the Eastern District of Missouri designated the case against Friedmeyer-Sellmeyer Distributing Company as "the most suitable case to try, brief and decide as a guide in the ultimate trying, briefing and decision in all of the above cases."[2] Appellants' App. at 255. On January 12, 1987, the district court ordered defendant Friedmeyer-Sellmeyer to submit to an audit of its personnel records from December 28, 1980, to December 31, 1983. Central States, Southeast & Southwest Areas Pension Fund v. N.E. Friedmeyer-Sellmeyer Disib. Co., 650 F.Supp. 978, 980 (E.D.Mo.1987). The audit was later expanded to cover the years 1979 to 1986. It revealed seven employees who worked essentially full-time for some if not all of the audit period. "[T]he audit report ... revealed that six of the seven employees included in the report worked virtually every week for over one year and one of these individuals worked all but two weeks during a period of nearly six years." Brief for Appellant at 16. William Kauck, who conducted the audit of Friedmeyer-Sellmeyer, testified that the audit revealed "an inordinate use of what the employer was calling 'casual employees.' " Trial Transcript vol. 1, at 127. As a result of the audit, Central States claimed that Friedmeyer-Sellmeyer owed $24,774 in delinquent contributions.
 
 
 6
 At the bench trial, Friedmeyer-Sellmeyer contended that its use of casual employees was consistent with the collective bargaining agreements, that no dispute or misunderstanding about casuals existed between the employer and the union, that none of the casuals were confused about their status as casuals, and that the only party complaining was Central States. The evidence established that it was standard practice for the Produce Row employers to initially hire all employees as casuals, some of whom might later become regulars upon a vacancy. Trial Transcript vol. 2, 67, 80, 147, 214. Several witnesses testified that the casuals knew of their status when hired, id. at 99, 116, 163, and that no one "other than Central States ever questioned which employees were casuals versus regulars." Id. at 163. Casuals were casuals merely because they were hired as casuals and because they received no benefits. Id. at 62, 64, 199.
 
 
 7
 The evidence is also clear, however, that casuals did the same work as regulars and in some cases worked as many hours as regulars. The testimony of Douglas Brand, the secretary-treasurer of United Fruit and Produce Company, is typical:
 
 
 8
 Q: Do they have the same hours at work?
 
 
 9
 A: They may.
 
 
 10
 Q: They work full time?
 
 
 11
 A: They may.
 
 
 12
 Q: Any difference in the hours of a casual or regular?
 
 
 13
 A: Not that I know of.
 
 
 14
 Id. at 109. Central States argued to the district court that these facts proved its case: that given the standard meaning of "casual employee"--someone who works sporadically or intermittently as needed--used in the collective bargaining agreement, those employees denominated casuals who worked as many hours as regular employees for a year or more were in fact regular employees.
 
 
 15
 The district court disagreed with Central States that the term "casual employee" in the collective bargaining agreement meant only those employees who worked sporadically or intermittently. Rather, the district court found the contract term to be ambiguous, and, after examining past hiring practices on Produce Row, held that the collective bargaining agreements had not been violated. "Quite simply, the Produce Row employers acted exactly as they agreed--they contributed to the pension fund on behalf of regular employees, but not on behalf of casual employees." Friedmeyer-Sellmeyer, slip op. at 10. In essence, the district court held that by "casual employee" the collective bargaining agreement meant whomever the employer so designated. This appeal concerns the correctness of that decision in the context of ERISA.
 
 II. DISCUSSION
 
 16
 Central States brought these actions pursuant to section 515 of ERISA, which provides that:
 
 
 17
 Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.
 
 
 18
 29 U.S.C. Sec. 1145. It is clear that this section "creates a federal right of action independent of the contract on which the duty to contribute is based." Bituminous Coal Operators' Ass'n v. Connors, 867 F.2d 625, 633 (D.C.Cir.1989). It is equally clear that Congress intended that this section would simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans. See, e.g., Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., 870 F.2d 1148, 1152 (7th Cir.1989).
 
 
 19
 Prior to the enactment of section 515 in 1980, collection actions brought by plan trustees were often converted into complex and costly litigation involving various contract formation defenses. Id. at 1152-53. Collection actions result in lower benefits and higher contribution rates not only because of this cost, but also because any shortfalls in contributions skewer the pension fund's actuarial planning.
 
 
 20
 The actuarial calculations that produce the contribution and payout systems are based on the supposition that the funds will receive full contributions on behalf of all employees covered. If a local union and an employer try to shrink the duty to contribute without notice to the funds and a contraction of the funds' obligations, the fund may end up paying benefits without corresponding contributions.
 
 
 21
 Robbins v. Lynch, 836 F.2d 330, 333 (7th Cir.1988).[3] See also Central States, Southeast & Southwest Areas Pension Fund v. Behnke, Inc., 883 F.2d 454, 460 (6th Cir.1989); Gerber, 870 F.2d at 1154-55; Connors, 867 F.2d at 633. Central States claims, for precisely these reasons, that it would not have accepted the plans from Produce Row for participation had it known of the employers' definition of "casual employee." "Because of the actuarial detriment inherent in arrangements that limit contributions to only those employees that are likely to receive benefits, the Pension Fund prohibits the participation of employers who split the bargaining unit for the purpose of pension coverage." Brief for Appellant at 26.[4]
 
 
 22
 Section 515 deals with these concerns by placing a pension fund in a better position than that which it would otherwise occupy in relation to the collective bargaining agreement. Because a pension fund is not a party to the collective bargaining agreement, it would normally be a third party beneficiary of it. Behnke, 883 F.2d at 460; Connors, 867 F.2d at 632; Robbins, 836 F.2d at 333; Southwest Adm'rs, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987). As a third party beneficiary, however, the pension fund would be subject to "any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract." Rozay's Transfer, 791 F.2d at 773. It is these contract defenses--for example, fraud in the inducement, oral side agreements or course of performance--that are most likely to breed litigation. Gerber, 870 F.2d at 1154. As a result, the courts find that section 515 places the pension fund in a better position, analogous to that of a holder in due course or a receiver of a failed bank--"entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." Id. at 1149. See also Benson v. Brower's Moving & Storage, 907 F.2d 310, 314 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990); Robbins, 836 F.2d at 333; Rozay's Transfer, 791 F.2d at 773. "If it means nothing else, section 515 means that ... suit [by a trustee] cannot be thwarted by defenses not apparent from the face of the Agreement." Connors, 867 F.2d at 634. The courts of appeals have been unanimous in so holding. See, e.g., Berry v. Garza, 919 F.2d 87, 89-90 (8th Cir.1990) (rejecting defense based on lack of majority status); Benson, 907 F.2d at 314-15 (rejecting defenses of abandonment of contract and lack of majority representation); Gerber, 870 F.2d at 1150-51 (rejecting defense based on oral agreement between the parties not to enforce the written terms of the collective bargaining agreement as to some employees); Robbins, 836 F.2d at 333-34 (rejecting as defense claim that union had agreed not to collect a payment called for by the agreement); Rozay's Transfer, 791 F.2d at 775 (rejecting claim that promise to make contributions was fraudulently induced); Southern California Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262, 1265-66 (9th Cir.1984) (same). In sum, the courts recognize only two defenses to a collection action: that the pension contributions are themselves illegal or that the collective bargaining agreement is void. Benson, 907 F.2d at 314.
 
 
 23
 Through section 515, Congress has decided that a pension fund is entitled to "assume that all participants in a plan are following the stated terms; no other approach permits accurate actuarial computations and proper decisions about which claims to pay." Robbins, 836 F.2d at 333 (emphasis added). Thus, whether the employer and union agree in this case that they knew what they meant by "casual employee" is irrelevant if the written agreement unambiguously expresses something other than what they intended. Absent ambiguity in the written agreement, the claims of the Produce Row employers are little different from a side agreement made with the union not to disclose their true intention to the pension plan. Absent ambiguity, it is clear that the employers in this case do not assert a defense apparent from the face of the agreements.
 
 
 24
 The district court considered the provisions of four collective bargaining agreements, from 1973, 1976, 1979 and 1982. Because the three agreements prior to the 1982 agreement contain similar provisions pertaining to casual employees, the district court referred only to the 1979 and the 1982 agreements. Casual employees are covered in Article IX of the 1979 agreement, which provides:
 
 
 25
 Employer may hire, subject to need, persons who will be known as "casual employees (casuals)." Such casuals may be used as follows and subject to the conditions listed:
 
 
 26
 1. Casuals may be hired where the normal then existing number of working employees is not thereby increased.
 
 
 27
 2. Notwithstanding the limitation in paragraph 1 above, casuals may be hired to work a cumulative maximum of eighty (80) hours during any calendar month for purposes of overflow work.
 
 
 28
 ....
 
 
 29
 4. Fringe benefits shall not be paid on account of casuals ... and no seniority shall be acquired by such casuals.
 
 
 30
 ....
 
 
 31
 6. Casuals may be used to replace regular employees who are absent for any reason ... provided, however, casuals will be used to fill vacancies on the shift where the vacancy occurs or exists.
 
 
 32
 Article IX was changed in the 1982 collective bargaining agreement by eliminating several of the restrictions on the use of casual employees. It still provides that "the Employer may hire, subject to need, persons who will be known as 'casual employees' (casuals)." Similarly, it still provides that casual employees are not entitled to fringe benefits, although it does provide for a separate seniority list for casuals. The provisions restricting hours and hiring such that the "normal then existing number of working employees" is not thereby increased, however, are absent.
 
 
 33
 Without reference to these differences between the pre-1982 and 1982 agreements, the district court found that "casual employees are specifically defined in the CBAs." Friedmeyer-Sellmeyer, slip op. at 4. Despite its reference to the specific definition, however, the district court found that "[t]he use of the term 'casual employee' in these agreements creates an ambiguity that requires the Court to apply ... rules of construction." Id. at 8-9. We disagree that any of the agreements are ambiguous.
 
 
 34
 As with any contract, whether a collective bargaining agreement is ambiguous is a question of law subject to de novo review. Ehrhardt v. Penn Mut. Life Ins. Co., 902 F.2d 664, 667 (8th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990); Lehman Bros. Kuhn Loeb v. Clark Oil & Ref., 739 F.2d 1313, 1317 (8th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). The law is clearly established in this circuit that a contract is ambiguous only if it is reasonably susceptible of more than one construction. Ehrhardt, 902 F.2d at 667; Lehman Bros., 739 F.2d at 1317; Universal Towing Co. v. United Barge Co., 579 F.2d 1098, 1101 (8th Cir.1978). In ascertaining whether a contract is reasonably susceptible of more than one construction, words are to be given their plain and ordinary meaning as understood by a reasonable, average person. NLRB v. Superior Forwarding, Inc., 762 F.2d 695, 697 (8th Cir.1985); Lehman Bros., 739 F.2d at 1317; Universal Towing, 579 F.2d at 1101. Recourse to the ordinary, dictionary definition of words is not only reasonable, but may be necessary. See Conoco v. Norwest Bank, 767 F.2d 470, 471 (8th Cir.1985).
 
 
 35
 Given that the provisions on casual employees in the pre-1982 agreements differ from those in the 1982 agreement, we must consider the agreements separately. Beginning with the pre-1982 agreements, we find no ambiguity. The dictionary contains a standard definition of "casual employment:"
 
 
 36
 Employment at uncertain or irregular times. Employment for short time and limited and temporary purpose. Occasional, irregular or incidental employment. Such employee does not normally receive seniority rights nor does he normally receive fringe benefits.
 
 
 37
 Black's Law Dictionary 198 (5th ed. 1979). The auditors for Central States who testified before the district court said that their understanding of "casual employee" was consistent with this definition. Joel Ahrens testified that "[w]e have an understanding or we use an assumption, I guess you would call it, in--for casual employees, we assume that a casual employee is not an employee who is going to work with any great regularity." Trial Transcript vol. 1, at 52-53. William Kauck also testified that he had a general understanding that a "casual employee" worked on a sporadic or infrequent basis, id. at 139, and that his understanding was consistent with the Central States field audit manual. Id. at 147-48. Ahrens further testified that Central States had a general understanding of "casual," id. at 64, and contrasted the employers' use of "casual" with a contract provision providing that people labeled "blue hats" would not receive pension benefits but all other employees would. Ahrens said that in that instance, "[w]e would want to know what a 'blue hat' is. I don't know what a 'blue hat' is." Id. at 63. By implication, Ahrens suggested that if the employers meant by "casual employee" something other than its dictionary definition--indeed, something contrary to its dictionary definition--they could have said so. Central States merely presumed that "casual employee" was used consistently with its dictionary definition.
 
 
 38
 The record makes clear that Central States thought it knew what the employers meant by "casual employee" because of that term's common meaning. It is also clear that Central States thought the restrictive provisions dealing with casuals contained in the pre-1982 agreements confirmed its understanding. We agree that the restrictive provisions in the 1979 agreement are consistent with the dictionary definition of "casual employee." Kauck testified that he understood the language "subject to need" in Article IX, section 2 and the limitation found in subsection 1, that "casuals may be hired where the normal then existing number of working employees is not thereby increased," to be consistent with his understanding that casuals worked sporadically as needed or as replacements. With reference to subsection 1, Kauck testified that "this particular provision says that--actually a casual can be used on a replacement basis. In other words, a regular employee can be off; they hire a casual employee to take his place for that time that he's off. And the normal then existing number of employees isn't increased." Id. at 141. Similarly, we think that the limitation on the number of hours to be worked by casuals found in subsection 2, and the provision in subsection 6 that casuals are to replace regular employees when absent, also support the standard meaning of "casual employee." Contrary to the assertion of the employers that "casual employee" is not defined in any of the agreements but is merely subject to various conditions, we think that these conditions help to define the term and do so consistently with the dictionary definition. From the face of the written documents, the pre-1982 agreements are not ambiguous.
 
 
 39
 It is also clear from the record before the district court that the hiring practices of Produce Row employers did not conform to this unambiguous definition in the pre-1982 agreements. As indicated, several witnesses for the employers testified that it was standard practice to hire all employees as casuals; only some would later become regulars. As for the restrictions in the pre-1982 agreements, the witnesses testified that the agreements were simply ignored. Brand testified that the practice of United Fruit and Produce under the 1979 agreement was to hire casuals even when that hiring increased the number of then existing working employees. Trial Transcript vol. 2, at 129-30. When asked whether he thought that such a practice violated the agreement, he agreed: "If you want to use what's on the paper here, yes." Id. at 130. Vincent Vogler, the lawyer who represented the employers in the negotiations culminating in the 1982 agreement, testified that the employers in 1979 had no idea what section two of Article IX meant. Id. at 208. He testified that subparagraph 1 "was not followed in past practices down there," and "was being totally ignored." Id. The hour limitation in subparagraph 2 was similarly ignored, id. at 209, as was subparagraph 6. "The facts are the past practices indicate that that formula and that procedure just wasn't going on." Id. at 215-16. Thus, not only were the pre-1982 agreements unambiguous, their terms were also ignored. The employers contend, however, that this evidence proves that the pre-1982 agreements did not reflect their actual intent, which is made clear by the changes in the 1982 agreement.[5]
 
 
 40
 This argument, however, has little to do with whether the written agreement is unambiguous. Given the dictionary definition of "casual employment," we disagree that the 1982 collective bargaining agreement was ambiguous. Even though several of the restrictions found in the 1979 agreement were deleted from the 1982 agreement, the parties retained the term "casual employee." In effect, they argue that by removing these restrictions from the 1982 agreement they gave a term a meaning contrary to its dictionary definition, and that they were not obligated to say so. Agreements are written purposely to avoid such a situation. "While interpreting contract language is not always easy, sticking to the words the parties actually used limits substantially the bounds of legitimate disagreement." Morta v. Korea Ins. Corp., 840 F.2d 1452, 1459 (9th Cir.1988). Were parties to a contract able to alter the usual definition of an unambiguous, written term by reference to their past practices or their own private agreement, reason could not justify the written word.
 
 
 41
 In essence, the employers argue that "casual employee" means anyone so intended by the employer and the union, even if contrary to the plain meaning of "casual employee" in the written agreement. In TKO Equip. Co. v. C & G Coal Co., 863 F.2d 541 (7th Cir.1988), the Seventh Circuit considered a situation in which a security agreement was written as a lease but contended by the parties to be a sale. The court held that if the parties meant for their agreement to be a sale, they should have said so.
 
 
 42
 If [the parties] wish the symbols "one Caterpillar D9G tractor" to mean "500 railroad cars full of watermelons", that's fine--provided parties share this weird meaning. A meaning held by one party only may not be invoked to change the ordinary denotation of a word, however. Intent must be mutual to be effective; unilateral intent does not count. Still less may the parties announce that they "share" an unusual meaning to the detriment of strangers, who have no way of finding out what was in the contracting parties' heads.
 
 
 43
 Id. at 545 (citation omitted). The employers in this case argue the contrary, that Central States is merely attempting to ascribe to "casual employee" its own meaning, not the meaning intended by the union and the employers, and that Central States cannot do this. "Central States does not have the right to pull up a chair to the bargaining table, long after the bargain has been struck, and tell the employer that the agreement he signed years ago means something other than that which the employer and union intended." Brief for Appellee at 23. Section 515, however, requires that what the parties to the bargaining agreement intended must be made clear from its face.
 
 
 44
 That intention was not clear in this case, and the testimony at trial confirms that the employers knew both that the meaning they attached to "casual employee" in the written agreements was unusual, and that Central States could not ascertain their meaning from the documents. When asked how a third party like Central States would be able to ascertain the status of casual employees under the 1979 agreement, Charles Gallagher, president of United Fruit and Produce Company, responded, "I couldn't tell you how they go to ascertain them." Trial Transcript vol. 2, at 90. While Vincent Vogler suggested that the parties had defined casuals by exclusion, i.e. a casual is anyone not a regular, id. at 226, Douglas Brand acknowledged that no definition of "regular employee" exists in the agreements. Id. at 150. More emphatically, however, Brand went on to acknowledge that the parties gave to "casual employee" an unusual meaning.
 
 
 45
 Q: [W]hat you're telling me is that you use the English language other than in the standard form.
 
 
 46
 A: In our case, yes.
 
 
 47
 Q: You had unique--you used words like "casual" and gave it a unique definition; isn't that true?
 
 
 48
 A: We didn't give a unique definition. Our term, "casual," means something similar to laborer. This contract was bought from an existing contract many, many years ago that had the word "casual" in it. The word "casual" in our business does not fit the word "casual" in your terms.
 
 
 49
 ....
 
 
 50
 Q: My question is, you have used the word "casual" in a unique manner, isn't that true?
 
 
 51
 A: Yes.
 
 
 52
 Id. at 151-52. Moreover, Brand was aware that Central States was not told of this unusual meaning given to "casual employee."
 
 
 53
 Q: You didn't tell Central States, did you, in the contract that you were using these words in a unique manner?
 
 
 54
 ....
 
 
 55
 A: I assumed when we sent you people the contract that they read it and that if they had any question about what this means, they would ask. And if they don't ask, they accepted.
 
 
 56
 Id. at 153.
 
 
 57
 Clearly, the union and the employers attached to "casual employee" a meaning different from its plain meaning and yet did not tell Central States of their intention. For purposes of ERISA, such conduct is no different from when parties orally agree to ignore the unambiguous terms of a written agreement. As indicated, section 515 was intended to preclude such a defense. Gerber, 870 F.2d at 1153. Whatever their intent, given an unambiguous agreement, the parties must follow its terms when dealing with the pension plan.
 
 III. CONCLUSION
 
 58
 The employers in this case argue that the agreements at issue were ambiguous, but not because of any misunderstanding between the parties to the contract. Given the purpose of written contracts and section 515 of ERISA, the parties to a collective bargaining agreement are bound by the terms of their agreement, regardless of their undisclosed intent. By so holding, we merely reaffirm a basic rule of contract interpretation. "A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared." Robbins, 836 F.2d at 332. Section 515 of ERISA emphasizes that this is especially true as to third parties obligated to administer a pension fund according to the terms of written agreements. The judgment of the district court is reversed and this matter is remanded for proceedings consistent with this opinion. Given our decision on the merits, the judgment of the district court denying the employers' request for attorneys' fees is affirmed.
 
 
 
 *
 The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 We have added to this consolidated appeal on the merits the consolidated appeal of George A. Heimos Produce Company and N.E. Friedmeyer-Sellmeyer Distributing Company, Nos. 89-2839 and 89-2840, which seek reversal of the district court's denial of their request for attorneys' fees. In its order of October 6, 1989, the district court held that the employers were not entitled to attorneys' fees because "there is no evidence of bad faith on the part of plaintiffs and plaintiffs' legal position was not frivolous." Given that we reverse on the merits, the district court clearly did not abuse its discretion in so ruling, and no separate opinion in the attorneys' fees appeal is warranted
 
 
 [2]
 The cases were originally assigned to four judges in the Eastern District of Missouri. Following entry of judgment in the Friedmeyer-Sellmeyer case, judgments for defendant-employers were entered in the other pending cases. This consolidated appeal followed
 
 
 [3]
 The importance of this rationale does not depend on whether any of those employees whom Central States regards as regulars, but whom the employers regard as casuals, actually files a claim against Central States for benefits. "[P]ension and welfare plans are insurance vehicles. Insurers depend on receiving contributions from persons who collect far in the future or not at all." Gerber, 870 F.2d at 1154. What matters is not whether the employees at issue ever attempt to collect, but that without contributions from those whom Central States claims are regulars according to the terms of the collective bargaining agreement, its actuarial assumptions are unsound. See id
 
 
 [4]
 Casuals were not union members until 1982. Trial Transcript vol. 2, 71, 117. Indeed, casuals were distinguishable from union employees in part because they did not wear union buttons. Id. at 63. Nevertheless, the parties seemed to agree at oral argument that casuals were part of the bargaining unit and that the union acquiesced in their exclusion from pension benefits. The district court rejected any argument based on splitting the bargaining unit, and no such argument has been made on appeal
 
 
 [5]
 The district court agreed with this argument. While acknowledging that some of the provisions in the pre-1982 agreements were not followed, Friedmeyer-Sellmeyer, slip op. at 9, the court suggested that they were "merely an aberration from the time-honored tradition and practice of using casuals heavily during the peak periods and slacking off when there was less work to be performed." Id. Hence, the court agreed with the employers that the 1982 agreement was merely "corrected" to reflect "the clear intention of the parties to the bargaining agreement." Id. As indicated below, we think that this analysis ignores both the purpose of written agreements and section 515