BEVERAGE INDUSTRY LOCAL NO. 744 HEALTH AND WELFARE FUND, and Beer Industry Local No. 744 Pension Fund, Plaintiffs,

v.

QUALITY BEERS LIMITED PARTNERSHIP, Defendant.

No. 99 C 1155.

United States District Court, N.D. Illinois, Eastern Division.

July 28, 1999.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In this action, Plaintiffs, Beverage Industry Local No. 744 Health & Welfare Fund and Beer Industry Local No. 744 Pension Fund ("the Funds"), allege that Defendant, Quality Beers Limited Partnership ("Quality Beers"), violated § 515 of the Employee Retirement Insurance Security Act ("ERISA") by failing to make certain contributions to the Funds in accordance with the governing collective bargaining agreement ("CBA"). Specifically, the Funds assert that Quality Beers improperly classified nine of its "permanent" employees, for whom contributions were required under the CBA, as "casual" employees, for whom contributions to the Funds were not required.[1] According to the Funds, Quality Beers owes $15,366.85 to the Health & Welfare Fund and $7,356.16 to the Pension Fund for these nine allegedly misclassified employees. Quality Beers responds that the nine contested employees were properly classified as "casual," and therefore, no violation of

---

1. The nine contested employees are: Mike Fleming, Nick Sciullo, Michael Martinez, Daniel Shaefer, Anthony Coretese, Michael Redinger, Timothy Serbin, Michael Bollin, and Jared Magid.

the CBA and ERISA occurred. Cross-motions for summary judgment are currently pending before this Court.

## FACTS[2]

The Chicago Beer Wholesalers Association, ("the Association"), and Local 744 of the Teamsters, (the "Union"), entered into a CBA that governed Quality Beers' contributions to the Funds during the disputed dates of January 1, 1995 through December 31, 1997.[3] (Def.'s App. A, The CBA between Local 744 and the Association, effective May 1, 1994—January 31, 1998 ("1994 CBA").) According to the integration clause of Article 20, § 18, the 1994 CBA "constitute[d] the full and complete agreement between the parties."

CBA Articles 18 and 19 govern contributions to the Funds. Articles 18, § 2 and 19, § 2 require Quality Beers to make contributions to the Funds on behalf of "permanent employees that worked eleven or more workdays in a given calendar month." Additionally, Articles 18 and 19 provide that contributions to the Funds are not required for "casual and summer employees." (1994 CBA Article 18, § 9; Article 19, § 8.)

The dispute currently before the Court arises from the classification scheme utilized in Articles 18 and 19: the Funds claim that the nine contested employees were permanent employees, while Quality Beers argues that they were casual. Although several sections of the CBA refer to permanent and/or casual employees, the CBA does not contain a definition section that governs the entire agreement. Article 6 (Seniority) and Article 12 (Wages) discuss the disputed terms in the most detail.

Section 1 (Definitions) of Article 6 (Seniority) states that permanent employees are workers "who have a permanent job assignment and who are part of the total complement of classified personnel within a distribution center.... All other em-ployees, including summer or casual employees, shall be considered temporary employees." Article 6, § 6 provides that "casual employees may be employed on a day-to-day basis ... [and] may be assigned as Helpers on package or draft routes or to any hourly rated job." Article 12 (Wages) states that "casual employees hired on a day-to-day basis" will be paid at a flat daily rate.

Quality Beers told the nine contested employees when they interviewed for positions that if they were selected, the company planned to hire them on a day-to-day basis, use them "as needed," give them assignments when they reported to work, pay them a flat daily rate, and would consider them for permanent employment if they received a valid commercial driver's license. Quality Beers also informed the contested employees that they would neither have a regular job classification nor be eligible for any contractual benefits.

The actual employment experiences of the contested employees mirror the representations made by Quality Beers during the application process: Quality Beers paid them a flat daily rate; a supervisor gave them daily assignments, typically as a helper on delivery routes or assisting with other tasks in the warehouse or at the customer's facility; and Quality Beers did not add them to the seniority list until they were officially hired as permanent employees. Like Quality Beers' other casual employees, the contested employees were not given contractual overtime, vacation time, holiday pay, or a guaranteed forty-hour work week. Furthermore, none of the contested employees "received designated permanent job assignments" or "were classified by [Quality Beers] as being part of its total complement in the designated categories" during the disputed timeframe. (Def.'s App. C, Pls.' Resp. to Def.'s First Req. for Admis., ¶¶ 6, 7.) Quality Beers eventually hired each of the nine disputed

---

2. The following facts are culled from the parties' Rule 12(M) and 12(N) statements of facts.

3. The CBA was effective May 1, 1994 through January 31, 1998.

employees as permanent employees and began contributing to the Funds on their behalf.

The parties have given this Court a significant amount of parol evidence concerning the meaning of the disputed terms. The CBA in effect prior to 1990 differed substantially from the current CBA. Most significantly, the prior CBA required employers to make contributions for "each employee" who worked eleven or more days during a calendar month. (Pls.' 12(N) Statement, ¶ 11.) In 1989, there was a protracted strike by the Union, resulting in certain changes to the 1990 CBA. Specifically, "casual" employees were incorporated into the "Seniority" definition of temporary employees and the contribution plans were modified from requiring contributions for "each employee" who worked eleven or more days during a calendar month to requiring contributions for "each permanent employee" who did so. These 1990 changes to the CBA carried over into the 1994 CBA.

The 1990 CBA was effective between August 17, 1990 and January 31, 1994, prior to the dispute at hand. During the governance of the 1990 CBA, confusion arose among the parties surrounding the meaning of the term "permanent employee" in the agreement. In 1992, the Union and the Association met to discuss this confusion and agreed to clarify the term:

> Any employee who is scheduled and expected to report for work daily on a continuous basis will be considered as a permanent employee upon completion of his probationary period {sixty (60) workdays following the first day on which he was scheduled and expected to report for work on a continuous basis. This would be a minimum of twelve (12) weeks in each of which there were five (5) scheduled workdays}. The employer will be obligated to make contributions on behalf of any such employee even though such employee does not have a permanent job assignment or job classification, provided such employee works on at least eleven (11) workdays during a calendar month.

(Def.'s App. M, Letter from Taylor to Sullivan of 6/16/92 ("Taylor letter").) On June 16, 1992, James W. Taylor, who served as both a Co–Chairman of the Funds and Vice–President of the Association, wrote a letter to the Funds' auditor, informing it of the new definition.

The "permanent" versus "casual" employee distinction became an issue again during the 1994 CBA negotiations. The Union essentially proposed a reversion to the pre–1990 status by eliminating all references to "casual employees" in the CBA and adding a requirement that contributions be made to the Funds for "each employee." (Def.'s App. D, 1994 Contract Proposals: Contract Proposals taken from Members of Teamster's Local Union 744 Employed in the Beer Industry, December, 10, 1993.) The Association rejected both proposals, incorporating neither into the 1994 CBA.

While neither the Funds nor their auditors explained the auditors' methodology followed in determining Quality Beers' alleged unpaid contributions between 1995 and 1997, the calculations appear to be based on the definition contained in Taylor's letter. The auditors apparently calculated contributions for the contested employees for each month following the initial sixty-days probation period in which the employees worked eleven or more days. The auditors then added interest at twelve percent per year, through December 31, 1998, for the allegedly unpaid contributions.

The Funds claim that Quality Beers owes contributions for the nine contested employees because, according to the Taylor letter, they became "permanent" after working sixty days. Alternatively, they argue that the CBA is ambiguous and that we should resort to a "plain meaning" analysis to determine whether the contested employees were permanent. Quality Beers responds that the 1994 CBA clearly defines "permanent employee", the contested employees do not satisfy that definition and, therefore, that it was not re-

quired to make contributions on behalf of those employees. Additionally, Quality Beers contests the propriety of considering the Taylor letter.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party does not need to produce evidence demonstrating the absence of a genuine issue of material fact, but can be discharged by pointing out the absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its burden of production, then the nonmovant "may not rest upon the mere allegations or denials of his pleading, but ... must· set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. Fed.R.Civ.P. 56(e). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" under the applicable substantive evidentiary standards. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all evidence is viewed in the light most favorable to the nonmoving party, *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,* 40 F.3d 146, 150 (7th Cir.1994), and all reasonable inferences are drawn in the nonmovant's favor, *Kirk v. Federal Property Mgmt. Corp.* 22 ·F.3d 135, 138 (7th Cir.1994).

"Summary judgment is particularly appropriate in cases involving interpretation of written contracts." *See ICEBU v. Hyster–Yale Materials Handling, Inc.,* 83 F.3d 930, 932–33 (7th Cir.1996), *citing Ryan v. Chromalloy Am. Corp.,* 877 F.2d 598, 602 · (7th Cir.1989). If a collective bargaining agreement is unambiguous, then the court should determine its meaning as a matter of law. *See, e.g., Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 565 (7th Cir.1995); *Diehl v. Twin Disc, Inc.,* 102 F.3d 301, 305 (7th Cir.1996). A contract is unambiguous if it is susceptible to only one reasonable interpretation. *Illinois Conference of Teamsters and Employers Welfare Fund v. Mrowicki,* 44 F.3d 451, 459 (7th Cir.1994). Put another way, a contract is ambiguous if the parties' differing interpretations of the contract are both reasonable. *Murphy,* 61 F.3d at 565.

## II. INTERPRETATION OF THE CBA

■ " 'A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts.' " *Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry.,* 138 F.3d 635, 640 (7th Cir. 1997), *quoting Transportation–Communication Employees Union v. Union Pac. R.R.,* 385 U.S. 157, 160–161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966). Unlike traditional contracts, collective bargaining agreements must be interpreted with the understanding that they are " 'a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.' " *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 311–312, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), *quoting United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). As a generalized code, collective bargaining agreements create a common law for a particular industry or plant. *See Warrior & Gulf,* 363· U.S. at 578–579, 80 S.Ct. 1347. In order to best interpret the common law of a CBA, courts should "foster industrial peace and stability" by reading it "with sensitivity to considerations of national labor policy." *Merk v. Jewel*

*Food Stores,* 945 F.2d 889, 892 (7th Cir. 1991).

In analyzing the relevant labor policy, we begin with the language of § 515 of ERISA:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

The history of pension plan litigation and § 515's legislative history illuminate its purpose. Prior to the enactment of § 515, collection actions brought by plan trustees often involved complex and costly litigation concerning contract formation defenses. *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv.,* 870 F.2d 1148, 1152–1153 (7th Cir.1989) (en banc). These collection actions resulted in lower benefits and higher contribution rates, not only to cover the cost of the litigation, but also to account for the shortfalls in contributions that skewed the pension fund's actuarial planning. *See Central States, Southeast and Southwest Areas Pension Fund v. Independent Fruit and Produce Co.,* 919 F.2d 1343, 1348 (8th Cir.1990). Congress believed that § 515 would solve these problems by protecting the pension funds, who are third party beneficiaries to the CBA, from contract defenses such as fraud, oral side agreements, and course of performance, by allowing them "to enforce the writing without regard to understandings or defenses applicable to the original parties." *Independent Fruit,* 919 F.2d at 1348, *quoting Gerber,* 870 F.2d at 1149. Thus, by focusing the parties and the courts' attention on the written agreement, "Congress intended that this section would simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans." *Independent Fruit,* 919 F.2d at 1348; *see also Gerber,* 870 F.2d at 1152–53 (quoting the manager in the House, Representative Thompson).

■ When considering an ERISA claim, federal common law rules of interpretation apply. *GCIU Employer Retirement Fund v. Chicago Trib. Co.,* 66 F.3d 862, 864, 865 (7th Cir.1995), *citing Phillips v. Lincoln Nat'l Life Ins.,* 978 F.2d 302, 307 (7th Cir.1992). One general contract principle that the Seventh Circuit applies to CBA interpretation is the "cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (discussing general contract law); *see Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.,* 73 F.3d 727, 731 (7th Cir.1996) (applying *Mastrobuono* to a CBA); *Murphy,* 61 F.3d at 565–67. When potentially conflicting provisions co-exist within the same agreement, courts "seek an interpretation that reconciles those provisions. At times this may compel a rather forced construction." *Diehl,* 102 F.3d at 306. However, a court should always do its best to interpret an ERISA-governed CBA "in an ordinary and popular sense as would a (person) of average intelligence and experience." *Phillips,* 978 F.2d at 307–08 (quotation omitted).

Articles 18 and 19 of the 1994 CBA set forth the guidelines governing the Health & Welfare Fund (18) and the Pension Fund (19). Section 2 of both articles, entitled "Employer Contributions," provides that "[t]he Employer agrees to [contribute] ... for each permanent employee who works on eleven (11) or more workdays during the calendar month ... No further contributions to such Fund shall be required except as herein otherwise provided." Section 9 of Article 18 and § 8 of Article 19 further state that "[t]he Employer shall not be required to contribute

to the Fund with respect to any summer or casual employee."

Other provisions of the CBA help supply meaning to the term "permanent employee" as it is used in § 2 of Articles 18 and 19. Section 1 (Definition) of Article 6 (Seniority) states that "[t]he word permanent shall mean employees who have a permanent job assignment and who are part of the total complement of classified personnel within a distribution center of a present employer." Article 12 sets forth the job categories of permanent employees.

■ Fortunately, we need not attempt to force a reconciliation of conflicting terms within the same agreement under a common meaning: no other provision of the CBA contains a definition of the term "permanent employee" and the term is regularly used throughout the CBA in a manner that is consistent with the definition of Article 6, § 1. *See Diehl,* 102 F.3d at 306. For this reason, we apply the definition of "permanent employee" in Article 6, § 1 to all other sections of the CBA, including § 2 of Articles 18 and 19, thereby achieving the cardinal principle of contract construction—giving effect to and consistency among all of the contractual provisions. *See Mastrobuono* 514 U.S. at 63, 115 S.Ct. 1212; *Kroger,* 73 F.3d at 731. Thus, the 1994 CBA requires contributions only on behalf of those employees who have a permanent job assignment, are part of the total complement of classified personnel, and have worked eleven or more days in the given calendar month.

The Funds admit that the contested employees neither "received designated permanent job assignments" nor "were classified by [Quality Beers] as being part of its total complement in the designated categories." (*See* Def.'s App. C, Pls.' Resp. to Def.'s First Req. for Admis., ¶¶ 6, 7.) In fact, the Funds do not argue that the nine contested employees satisfied the CBA standards for permanent employees, or that Quality Beers should have classified them as permanent employees. Additionally, they admit that "contributions are required *only* for permanent employees."

(Def.'s App. C, Plaintiffs' Admissions ¶ 1.) Because the 1994 CBA requires contributions only for permanent employees and the Funds cannot establish that the nine contested employees were "permanent employees", no reasonable jury could conclude that Quality Beers should have paid contributions to the Funds on behalf of the nine contested employees. Thus, summary judgment in favor of Quality Beers is appropriate.

## III. THE TAYLOR LETTER

■ The Funds attempt to avoid this outcome by relying on the 1992 Taylor letter, which purported to clarify the definition of "permanent employee" in the 1990 CBA. As a general rule, related documents should be read together. *See Kroger,* 73 F.3d at 731; *see also Murphy,* 61 F.3d at 565. Thus, in *Kroger,* the court found that a Master Agreement and its Local Supplement—executed by the same parties, at the same time, and each referring to the other—were "related documents" that should be read in totality when determining whether the contract was ambiguous. 73 F.3d at 731–32; *see also Murphy* 61 F.3d at 567; *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 713 n. 13 (7th Cir.1985). However, when documents are not executed simultaneously and their terms conflict, the latter executed of the two takes precedent over the earlier one. *See Diehl,* 102 F.3d at 307.

The Taylor letter, which was written in 1992, was neither executed at the same time as the 1994 CBA nor referenced in the 1994 CBA. In fact, the CBA explicitly provided that "[t]his agreement constitutes the full and complete agreement between the parties." (1994 CBA Art. 20, § 18.) Furthermore, the Taylor letter's definition of permanent employee is not confined in its application to any particular provision of the CBA, and therefore directly conflicts with the definition of permanent employee contained within Article 6, § 1. Thus, the letter cannot be considered "part of" the 1994 CBA.

■ This, however, does not end our inquiry into the letter. The Funds argue that the Taylor letter's definition of permanent employees should be enforced as a "side letter agreement." This argument must fail. The parol evidence rule enforces integration clauses by barring evidence of side agreements, unless the side agreement clarifies the meaning of ambiguous contractual language. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir.1993) (en banc) (plurality opinion); *citing FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989). The Funds, despite their assertions to the contrary, are not trying to clarify ambiguous text with the Taylor letter, but are trying to contradict a clear definition of permanent employee contained within Article 6, § 1 of the CBA. Under *Bidlack* and the parol evidence rule, this cannot be done. Even if the Funds were to argue that they are not contradicting the definition of permanent employee in Article 6, § 1, but are merely supplying a different definition for permanent employees under § 2 of Articles 18 and 19, "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack*, 993 F.2d at 608 (plurality opinion); *citing Calder v. Camp Grove State Bank*, 892 F.2d 629, 632 (7th Cir.1990). The 1994 CBA is complete and unambiguous with respect to the meaning of "permanent employee." [4]

## IV. THE FUNDS' PLAIN MEANING AND NEGATIVE INFERENCE ARGUMENT

The Funds also try to get around the Article 6, § 1 definition of permanent employees by arguing that it should be confined to the seniority provisions of the CBA. The Funds then argue that permanent employees for whom contributions are due under Articles 18 and 19 can be determined through negative inference: if the employees are neither casual nor summer employees, then they must be perma-

nent employees. The Funds state that it is undisputed that the contested employees were not summer employees, and they then argue that the Court should resort to the dictionary definition of casual employee to interpret its meaning, as the Eighth Circuit did in *Independent Fruit*, 919 F.2d at 1350–51.

The Funds' plain meaning and negative inference argument necessarily fails. As we already concluded, the provisions of the 1994 CBA must be read holistically, not piecemeal. Moreover, reliance upon the dictionary definition of terms in a CBA is only proper if the meaning of the terms cannot be ascertained from the CBA itself. *See Central States, Southeast and Southwest Areas Pension Fund v. Hartlage Truck Service Inc.*, 991 F.2d 1357, 1361–62 (7th Cir.1993); *Independent Fruit*, 919 F.2d at 1349, 1352. As we have demonstrated, the meaning of permanent employee can be readily ascertained from Article 6, § 1. Therefore, there is no need to attempt to define permanent employees through a negative inference from the meanings of casual and summer employees.

## CONCLUSION

For the reasons stated above, the Court grants Quality Beers' motion for summary judgment, (R. 10–1), and denies the Fund's cross-motion for summary judgment, (R. 14–1). The Clerk of Court is directed to enter final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant Quality Beers and against Plaintiffs.

---

4. We need not decide whether the Taylor letter constitutes a "side letter agreement" or whether it in fact modifies the 1990 CBA in any way: the 1994 CBA governs the disposition of this case and supersedes the content of the Taylor letter either way.