J.F. McKINNEY & ASSOCIATES, LTD., Plaintiff–Appellant,

v.

GENERAL ELECTRIC INVESTMENT CORPORATION, Defendant– Appellee.

No. 98–3914.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1999.

Decided June 30, 1999.

**620**

Michael T. Trucco (argued), Ungaretti & Harris, Chicago, IL, Charles C. Bletsas, Stamos & Trucco, Chicago, IL, for Plaintiff–Appellant.

Terry M. Grimm, Bruce R. Braun, Bradley C. Graveline (argued ), Winston & Strawn, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

For $50,000, Prudential Insurance Company sold John McKinney a 70–day option to purchase a long-term note secured by a mortgage of 200 South Wacker Drive, a large building in Chicago. The exercise price was 103% of the principal balance of the loan, estimated to be about $47,200,000 by the end of the option period. The exercise price reflected that interest rates had fallen since Prudential made the loan. To earn the same cash flow as the note represented, an investor today would have to put up more than what Prudential invested. McKinney hoped that interest rates would not rise, for then it would not be profitable to buy the note for 103% of the principal, when equal or greater cash flows could be obtained elsewhere for less. (Because the note was long-term, even a small change in the market interest rate could have a large effect on the note's capital value.) Prudential correspondingly hoped that interest rates would not fall; if they did, Prudential could not shop for a better price in the market but would be required to sell to McKinney. This is the risk for which the $50,000 payment compensated Prudential.

Through his brokerage firm J.F. McKinney & Associates (M&A), McKinney set out to find a purchaser for the note. M&A made presentations to many potential buyers; General Electric Investment Corp. (GEI) showed the most interest, and it ultimately signed an agreement to compensate M&A for its role as a broker. GEI's investment committee authorized the purchase of the note. Eventually GEI declined to buy the note through M&A, because interest rates rose by enough to make the 103%-of-principal price unattractive. The record implies that GEI negotiated directly with Prudential for a better price after McKinney's option expired. M&A filed this suit for breach of contract and lost on summary judgment after the district court concluded that the only contract was for M&A's brokerage. 1998 U.S. Dist. Lexis 16537 (N.D.Ill.1998). GEI had never committed itself to buy the note, the judge concluded; it had agreed only on how much it would pay M&A *if* it purchased the note through McKinney's option.

M&A allows that GEI never signed a document saying in so many words that it would buy the note. Nonetheless, it insists, GEI made a contract through a series of documents that the parties exchanged. M&A relies particularly on three writings:

- M&A's portfolio of information given to GEI and other potential customers. The portfolio contains details about the note, the mortgage, the use and value of the building, and the tenants' payment history. It also explains the terms of the option to purchase the note.

- A letter from GEI to M&A, dated March 7, 1997, specifying compensation terms for M&A's services. (We reproduce this below.)

- A letter from M&A to GEI, dated March 17, and reading: "We are formally confirming our acceptance of General Electric Investment's proposal to us dated March 7, 1997 in connection with the acquisition of the mortgage loan collateralized by 200 S. Wacker Drive, Chicago, Illinois. As we told Preston last week, we are choosing the compensation structure offered to us in the proposal and defined as Option I: Transaction Fee With No McKinney Participation, Immediate Payout. We

have informed Preston of the timing issues regarding closing. We look forward to working with you on this exciting transaction." M&A says that this—coupled with GEI's failure to protest—demonstrates the parties' shared understanding that an agreement had been reached on the purchase of the note as well as on M&A's compensation for brokerage.

The district court thought that some vital terms were missing in this exchange. None of the papers specified the price GEI would pay for the note. Would it be 103% of the principal? What if the market interest rate changed before closing? What if one of the tenants defaulted or vacated during this period? None of the papers specified *who* GEI would buy the note from. We simplified things by saying that McKinney bought the option. Actually, Prudential sold the option to Hartford–Wacker Investors, Inc., a corporation that had yet to be formed. McKinney was its promoter. Before the option could be exercised, McKinney had to incorporate Hartford–Wacker Investors and transfer the option to it. Then either Hartford–Wacker Investors would sell the option to GEI so that it could deal directly with Prudential, or GEI would lend Hartford–Wacker Investors the funds to exercise the option, in exchange for which McKinney would transfer ownership of his shares in Hartford–Wacker Investors to GEI. Details such as this require careful specification, and the papers M&A exchanged with GEI did not mention how the transaction would be completed. Although GEI's loan committee approved the purchase, this did not create a contract until essential details had been worked out. Indeed, the district judge remarked, the fact that M&A rather than Hartford–Wacker Investors (or McKinney personally) is the plaintiff shows how far these parties were from a deal. M&A did not own the option and therefore can not collect damages for GEI's failure to purchase it.

█ M&A has displayed a curiously casual approach to a $47 million contract about an option it did not even own. In response to the district judge's observation about the role of Hartford–Wacker Investors, M&A observes that McKinney and M&A should be treated as identical, because after all McKinney is M&A's president. We very much doubt we would hear such a line if McKinney were the defendant in a suit seeking to collect M&A's debts from him. Then he would be sure to insist on the limited liability of corporate investors, and to assert that only M&A could be held liable. Corporations can't disregard their separate existence whenever that is convenient, while insisting that the forms be observed when that will shield their investors. See *In re Baker*, 114 F.3d 636 (7th Cir.1997); *In re Deist Forest Products, Inc.*, 850 F.2d 340 (7th Cir.1988). Cf. *TKO Equipment Co. v. C & G Coal Co.*, 863 F.2d 541 (7th Cir.1988). Whether corporate forms may be disregarded is a question of Illinois law (which the parties agree governs their dispute), and as the parties have not briefed it (a shortcoming by GEI that amounts to forfeiture) we proceed to the underlying contract question.

█ Unless GEI's letter of March 7 commits it to purchase the note, M&A cannot prevail. Here is the full text of the letter to McKinney:

Thank you for sending me updated financial information on *200 South Wacker Drive*. We now have a better understanding of the underlying financial characteristics of the building and are eager to move forward with you on this transaction. As we discussed, it is important to us that McKinney & Associates is fairly compensated. It is also important that this compensation does not overly burden the transaction and GEI's returns, in the event that a participation scenario never comes to pass. We have therefore outlined two compensation options for your consideration:

OPTION I: Transaction Fee With No McKinney Participation
Immediate Payout: GEI will fund principal balance, Prudential prepayment premium, closing costs and a one-time

placement fee to McKinney & Associates of $600,000.

Deferred Payout: GEI will fund principal balance, Prudential prepayment premium, closing costs and a one-time placement fee to McKinney & Associates of $200,000. In addition, McKinney will receive $10,000 monthly payments until loan maturity (total monthly payments approximate $500,000)[.]

OPTION II: Transaction Fee With McKinney Participation

GEI will fund the principal balance, Prudential prepayment premium, closing cost[s] and a one-time placement fee to McKinney & Associates of $250,000. In addition, McKinney & Associates will share in a portion of upside created by a loan restructure. The sharing formula would be similar to the Participation Mortgage Financial Summary outlined in Tab II of your presentation. However, we expect that there would be a cap on your aggregate participation in the range of $1,500,000. In addition, [to?] the extent that GEI controls leasing decisions, McKinney & Associates will be assigned leasing responsibilities at the project.

We are excited about this transaction and are anxious to hear your thoughts on our proposals. Please call Preston or me at your earliest convenience.

Like the district judge, we read this letter to mean what it says: it proposes "two compensation options" for M&A, but it does not promise to buy the note. No one commits to spend more than $47 million without specifying details such as price, payment terms, closing date, and adjustments for taxes and closing costs. M&A's contention that GEI must have agreed to whatever terms were contained in the Prudential option begs the critical question: *did* GEI so commit? The letter does not incorporate by reference the option or any of M&A's promotional documents. See *Harrison v. Sears, Roebuck & Co.*, 189 Ill.App.3d 980, 988–89, 137 Ill.Dec. 494, 546 N.E.2d 248, 253–54 (4th Dist.1989). Nor

does M&A explain why GEI would have made such a commitment, given the possibility that interest rate movements before the closing could make the price unattractive. Rare indeed is the investor who will agree to buy a security at a price fixed in the past without being compensated for the risk that its value will change. M&A essentially argues that GEI implicitly gave it a put option, without charging an option premium. GEI does not strike us as that careless (or credulous).

▮ Parties can decide for themselves whether their dealings will be formal or informal. M&A tells us that in light of this principle a jury could conclude that GEI had agreed to treat the ambiguous communications as adequate to create a legally effective promise. Perhaps this is how M&A understood the events, but the beliefs of one side to a negotiation do not control; Illinois uses an objective theory of contract under which understandings and beliefs are effective only if *shared*. *Empro Manufacturing Co. v. Ball–Co Manufacturing, Inc.*, 870 F.2d 423 (7th Cir.1989) (Illinois law); *Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 364, 247 N.E.2d 886, 888 (1969). It is not enough to get halfway to a contract and then hope that the jury will complete the process; the parties themselves must show assent. *Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981 (1991). Permitting a jury to read a promise into a communication as incomplete as the March 7 letter would undermine the utility of contract as a risk-allocation device, and complicate litigation as well. The documents exchanged between M&A and GEI did not by any stretch of the imagination reveal how the parties allocated the risk that interest rates would change before the expiration of the option. Asking a jury to supply its own answer would be no better than a coin flip, and we are confident that Illinois law does not entitle a party in M&A's position to ask a jury for the sort of

commitment it did not obtain from its negotiating partner.

AFFIRMED.